# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00454-CR

**Suzanne Kearns Dewalt, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF COMAL COUNTY, 207TH JUDICIAL DISTRICT
## NO. CR2006-132, HONORABLE GARY L. STEEL, JUDGE PRESIDING

## O P I N I O N

After a Comal County jury awarded sole managing conservatorship of her five year-old son to his father—her ex-husband—rather than her, appellant Suzanne Kearns Dewalt fled with the child to Mexico. Almost three years later, Dewalt was apprehended in that country and returned with the child to Comal County. She was subsequently indicted for the offense of aggravated kidnapping. Another Comal County jury found her guilty and assessed punishment at five years' imprisonment and a $10,000 fine. In four issues on appeal, Dewalt argues that the district court abused its discretion in excluding evidence to the effect that she acted as a "protective mother" in fleeing the jurisdiction based on her belief that her ex-husband would harm the child. Dewalt also complains that the district court abused its discretion in limiting her voir dire, that she is entitled to an instructed verdict because proof of the elements used to aggravate her kidnapping

charge "were subsumed within the proof of the underlying offense," and that the State failed to meet its burden of proving venue in Comal County. We will affirm the judgment of conviction.

**BACKGROUND**

Dewalt married Michael Craig Dewalt, then a U.S. Navy officer, in 1995. On October 1, 1997, the couple's only child, a son, J.M.D., was born. At the time, the family lived in Japan, where Michael,[1] on his first overseas tour following his graduation from the Naval Academy and earning his "wings," was deployed on an aircraft carrier out of the Atsugi naval base. Subsequently, claiming that pollution was causing J.M.D. health problems, Dewalt moved with the child to San Antonio, where her parents lived. According to Michael, the couple experienced marital difficulties that ultimately prompted him to obtain reassignment to Corpus Christi, Texas, where he could rejoin his family. The couple's domestic strife continued nonetheless, and Michael filed for divorce in April 1999. The final divorce decree, signed later that year, named Dewalt and Michael joint managing conservators, with Dewalt having the right to determine J.M.D.'s primary residence.[2]

In March 2002, Dewalt filed a petition in Comal County district court to terminate Michael's parental rights to J.M.D.[3] Michael counter-claimed for sole managing conservatorship.

---

[1] Because Michael and Suzanne Dewalt share a common surname, we will use "Michael" to distinguish him from the appellant. We will similarly use first names to distinguish Dewalt's parents, Ed and Margaret (Peggy) Kearns.

[2] The final decree was rendered by a Nueces County district court.

[3] In the interim, Dewalt and J.M.D. had moved at least twice, living in the Austin area before ending up in New Braunfels. Consequently, continuing jurisdiction over the suit affecting the parent-child relationship had been transferred to the Williamson County District Court in 2000, then to the Comal County District Court in 2001.

2

The custody suit went to trial before the Hon. Jack Robison beginning on Monday, October 14, 2002. After two weeks of trial, the district court submitted the case to the jury during the afternoon of Friday, October 25. The charge inquired as to (1) whether Michael's parental rights to J.M.D. should be terminated, and if not, (2) whether the existing joint managing conservatorship should be replaced with a sole managing conservatorship, and if so, (3) whether Michael should be named sole managing conservator.[4] At approximately 9:40 p.m., the district court, in Dewalt's presence, received the jury's verdict. The jury found that Michael's parental rights should not be terminated, that the existing joint managing conservatorship should be replaced with a sole managing conservatorship, and that Michael should be J.M.D.'s sole managing conservator. The evidence was undisputed that the district court, in Dewalt's presence, proceeded to accept the jury's verdict and ordered that Michael was appointed sole managing conservator of J.M.D. A final written judgment was later signed in December 2002.

It is undisputed that after the jury rendered its verdict and Judge Robison ordered that Michael would have sole custody of J.M.D., Dewalt did not comply with or seek appellate remedies from the ruling, but instead fled to Mexico with the child. She remained a fugitive with J.M.D. until September 2005, when she was apprehended in Zacatecas and returned with the child to Comal County. Dewalt was indicted for kidnapping, interference with child custody, and hindering apprehension. These indictments were subsequently dismissed and Dewalt was re-indicted for aggravated kidnapping, a first-degree felony. *See* Tex. Penal Code Ann. § 20.04 (West 2003). The

---

[4] In the further alternative, the charge inquired as to whether Michael should be named the joint managing conservator with the exclusive right to determine J.M.D.'s primary residence. The jury did not reach that issue.

aggravated kidnapping indictment contained two alternative paragraphs, each of which alleged that Dewalt had committed the elements of kidnapping, but with a different aggravating element. Specifically, both paragraphs alleged that on or about October 25 (the last day of her custody trial), Dewalt (1) "intentionally or knowingly" (2) abducted J.M.D. by (a) restraining him "so as to interfere substantially with his liberty, by moving him from one place to another," and he was a child of less than 14 years of age whose "parent and sole managing conservator," Michael Dewalt, or guardian ad litem, "had not acquiesced in the movement of the child," (b) "with intent to prevent his liberation by secreting and holding [J.M.D.] in a place where he was not likely to be found."[5] The first of the two paragraphs, Paragraph A, further alleged that Dewalt had "committed such acts with the intent to facilitate the commission of a felony, to wit: inference with child custody."[6] *See id.* § 20.04(a)(3). The second, Paragraph B, alleged that Dewalt had "committed such acts with the intent to interfere with the performance of a governmental function, to wit: a Comal County District Court Jury Trial, the Jury's Verdict and/or the interim orders of the District Court Judge." *See id.* § 20.04(a)(6).

---

[5] The elements of aggravated kidnapping are (1) intentionally or knowingly (2) "abducting" another person—the elements of kidnapping—plus (3) committing an aggravating element. *See* Tex. Penal Code Ann. § 20.04(a) (West 2003); *Laster v. State*, 275 S.W.3d 512, 521 (Tex. Crim. App. 2009); *cf.* Tex. Penal Code Ann. § 20.03(a) (West 2003) (elements of kidnapping). Chapter 20 of the penal code defines "abduct" in relevant part as "to restrain a person with intent to prevent his liberation by (A) secreting or holding him in a place where he is not likely to be found." Tex. Penal Code Ann. § 20.01(a)(2)(A) (West 2003). "Restrain," in turn, means "to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person." *Id.* § 20.01(a)(1). Restraint is "without consent" if it is accomplished by: (A) "force, intimidation, or deception"; or (B) "any means, including acquiescence of the victim," if the victim is a child who is less than 14 years of age and the parent, guardian, or person or institution acting in loco parentis has not acquiesced in the movement or confinement. *Id.*

[6] *See* Tex. Penal Code Ann. § 25.03(a)-(b) (West Supp. 2008).

4

Trial proceeded on the aggravated kidnapping charge.[7]  During the guilt-innocence phase, the State presented evidence that Dewalt had planned, even before her child-custody trial began, to flee the country with J.M.D. in the event of an adverse outcome.  A former neighbor of Dewalt and J.M.D. in New Braunfels, Kelly Veidt, testified that on October 3, Dewalt told her that if she was not granted custody of J.M.D., she would leave the country with the child, possibly going to Japan, because she had previously lived there, and that Dewalt anticipated being able to make a living by teaching English.  Veidt further recounted that when discussing Dewalt's possibly leaving the country, Dewalt, who was a writer and editor by trade, indicated, "When this is all over I'm going to write a book about a mother who has to take her child because she didn't get custody or because custody was granted to the wrong person."

Later that month, on or about October 8, Dewalt met in New Braunfels with Jose Uribe, a Mexico City native and U.S. legal resident who operated a New Braunfels business that imported products from Mexico.  Uribe had previously hired Dewalt to prepare marketing materials for his company.  Dewalt, according to Uribe, had approached him for advice regarding travel to Mexico and living in that country.  By the time of their meeting, according to Uribe, Dewalt had already decided that "if she lost the trial she would go to Mexico" and stated, "I definitely think we're going to need to go to Mexico."  He added that Dewalt divulged that she had consulted with her child-custody trial attorney regarding her planned disappearance to Mexico and that she

---

[7]  As we explain below, the district court had conducted some pretrial hearings in the causes under the prior indictments.  The court's pretrial rulings in those causes, including a significant ruling limiting Dewalt's presentation of evidence, were carried over into the new cause by agreement.

anticipated staying in touch with him until "eventually it was going to work out and that she could come back when she knew it was okay to come back."[8]

Among the topics the pair discussed, Uribe further testified, were the resources that Dewalt would need in Mexico. Dewalt, according to Uribe, indicated that she had between $6-7,000 set aside for use on the trip.[9] She also asked for Uribe's assistance in driving her to the border when the time came. Uribe agreed to help her, and gave her his cell phone number.

The State also presented evidence that, as the end of the custody trial approached, Dewalt, with the assistance of her parents, Ed and Margaret (Peggy) Kearns, concealed J.M.D.'s whereabouts from the district court. The Kearnses lived in San Antonio in a house located approximately 25 miles from the Comal County courthouse. Although J.M.D. had previously remained in New Braunfels while his mother was in trial, Peggy brought him to San Antonio sometime on Thursday, October 24. During the following day, Friday, October 25, Peggy took J.M.D. to the San Antonio home of a close friend, Maxine Vaughn.[10] Ms. Vaughn testified that Peggy called her during the day asking to come over with J.M.D.[11] According to Vaughn, Peggy and J.M.D. arrived around noon. Vaughn added that Peggy had seemed upset but

---

[8] The record reflects that these and other allegations implicating Dewalt's trial counsel referred to her primary attorney at the time, a Louisiana lawyer who was appearing pro hac vice.

[9] The State also emphasized that Dewalt, along with Veidt and others, had a garage sale earlier in the month, suggesting that Dewalt was attempting to liquidate assets in preparation for her flight.

[10] There was also testimony that Peggy may have also brought the child to Vaughn's house on the 24th.

[11] Vaughn indicated that Peggy had brought the child to her home only once previously.

indicated to Vaughn, "I don't want to talk about it and get you involved in any of it." There was also evidence that Peggy brought along packed suitcases and personal belongings.

Later that evening—witnesses placed the time range at between approximately 8:30 and 8:50 p.m.—the jury indicated to the bailiff that it had reached a verdict. At some point during deliberations or before he called the jury in to receive the verdict, Judge Robison, according to several witnesses, inquired of Dewalt where J.M.D. was located. Dewalt, these witnesses recounted, responded that the child was at her mother's house in San Antonio and provided the Kearnses' address. This exchange would have occurred when, according to Ms. Vaughn, J.M.D. and Peggy were instead at her house, not the Kearnses' house. There was also testimony that at some point before the jury rendered its verdict, Judge Robison ordered Dewalt and her attorney to have J.M.D. brought to the courtroom and that they assured him the child was on his way.

Judge Robison also prepared a written order directing a sheriff's deputy who had been working courthouse security, Dana Myers; J.M.D.'s guardian ad litem, Michael D. Bowles; or "an employee of Child Protective Services" to immediately transport J.M.D. to the courtroom. There was no evidence, however, that Dewalt was made aware of this particular order. Based on Dewalt's prior representations that the child was at the Kearnses' house, Deputy Myers, with the order in hand, proceeded to that location, accompanied by her husband (who happened to be the police chief of Garden Ridge) and J.M.D.'s CPS caseworker. After being advised that Deputy Myers had arrived at the Kearnses' house, Judge Robison called in the jury, accepted the verdict, and ordered from the bench that Michael would have sole managing conservatorship of J.M.D. That event, it is undisputed, occurred at approximately 9:40 p.m.

7

Meanwhile, at the Kearnses' residence in San Antonio, no one was answering when Myers's group knocked on the door and rang the doorbell. Judge Robison was so advised, and he again asked Dewalt, who was still present in the courtroom, where J.M.D. was. According to the guardian ad litem, Michael Bowles, Dewalt responded, "with my mother." When pressed by Judge Robison, "Well, where are they?," Dewalt, recounted Bowles, "began to recite the Kearnses' street address and became emotional and never quite finished."

During the ensuing minutes, however, Dewalt, accompanied by Ed Kearns, was able to walk out through the back of the courtroom, into a hallway, and onto an elevator. Shortly thereafter, Judge Robison ordered sheriff's deputies who were working courthouse security to find her. They searched the courthouse and surrounding area, but determined that Dewalt and Ed Kearns had already left the building and driven away.

The State presented evidence that as these events were occurring at the courthouse, Dewalt, her parents, and Uribe were coordinating in transporting J.M.D. to Mexico. Jose Uribe testified that he received a call on his cell phone from Peggy Kearns; there was also evidence that Dewalt called him. Uribe's cell phone records were in evidence. They reflected incoming calls at 8:49 and 9:03 p.m., which correspond roughly to the time at which the jury had indicated that it had reached a verdict. Peggy, according to Uribe, advised him that "they might have to go to Mexico," further indicating that she was at the home of a friend named Maxine. Uribe proceeded from his home in Comal County in his minivan, arriving at Ms. Vaughn's house shortly after 9:50. Uribe testified that while he was at that location, Peggy received a call from Dewalt. Uribe testified that he insisted on speaking with Dewalt, hoping to discourage her from fleeing to Mexico, but she

8

responded "she was going anyway" and asked him to drive J.M.D. and Peggy to Laredo. Although Uribe initially refused to drive them to Laredo, he agreed to go as far as Pearsall and meet Dewalt there.[12] Uribe added that packed suitcases had been placed in Maxine's garage and that he assisted in loading them into his minivan.

From there, with J.M.D. and Peggy in his minivan, Uribe testified that he drove south on I-35 to Pearsall, where his group rendezvoused with Dewalt and Ed Kearns, who arrived in the same vehicle. At this point, according to Uribe, he agreed to continue toward the border with Dewalt and J.M.D. riding with him and the Kearnses in the other vehicle. Upon reaching Laredo, Ed, according to Uribe, declined to proceed further. Uribe admitted that he continued in his minivan, leading the other vehicle across the border and then to a hotel. Uribe then returned to the U.S., picked up Ed in Laredo, and proceeded back toward Comal County, dropping off Ed along the way at his San Antonio home.

The State presented additional evidence of Dewalt's planning prior to her flight that was later recovered from her New Braunfels home, including a handwritten to-do list and instructions for deleting a computer hard drive. Also, when apprehended in 2005, Dewalt had in her possession a Texas driver's license belonging to her sister, with indicia that she had used it in disguising her identity while in Mexico, as well as business cards indicating that—consistent with her statements to Kelly Veidt in early October 2002—Dewalt had earned some income in Mexico by teaching English.[13] The State also presented evidence—including email correspondence

---

[12] Pearsall is located approximately 55 miles southwest of San Antonio in Frio County.

[13] The jury also heard evidence that the Kearnses had continued thereafter in assisting Dewalt in her efforts to remain in Mexico and avoid capture. Peggy Kearns remained in Mexico, assisting

between Dewalt and friends in the U.S., including Uribe—reflecting that Dewalt continually took precautions to avoid discovery and capture in Mexico, including adopting pseudonyms for both herself and J.M.D.,[14] moving as many as nine times, and taking evasive action when encountering law enforcement.[15]

Finally, Michael testified that he had not consented to the movement of J.M.D. by Dewalt and her accomplices after Judge Robison had ordered that he would have sole custody of J.M.D. On the other hand, it was undisputed that until that time, Dewalt continued to possess the right under her divorce decree with Michael to determine J.M.D.'s residence. Additionally, Bowles, J.M.D.'s guardian ad litem, acknowledged that Dewalt was within her rights to take J.M.D. to visit his grandparent's house in San Antonio, although he indicated that Judge Robison had entered an order preventing her from changing J.M.D.'s permanent residence from Comal County. He also admitted that the custody trial jury had been discharged before Dewalt fled to Mexico and that her

---

Dewalt by providing child care for J.M.D., until returning to Comal County in September 2003. There was also testimony that during the days immediately following Dewalt and J.M.D.'s disappearance, Ed Kearns misled Comal County authorities by claiming falsely that Dewalt had dropped him off at his San Antonio home following trial and concealing his knowledge of her flight that evening to the border. There was also evidence that Mr. Kearns subsequently sent Dewalt money in Mexico. The record reflects that the Kearnses were charged and later convicted of offenses in connection with their actions.

[14] Upon his return, J.M.D., Michael testified, continued to insist that his name was "John Johnson" until Michael convinced him otherwise by showing him his birth certificate.

[15] Dewalt's email correspondence recounts an episode in which she "covered up" J.M.D. and pretended to be asleep when Mexican federal police searched for a "nino" on a bus they were riding. In another instance, Dewalt claimed that she and J.M.D. temporarily abandoned their possessions and went into "hiding" with a friendly pastor after police had knocked on their door at 1:30 a.m. In regard to both encounters, Dewalt expressed fear that she would be apprehended.

flight did not interfere with the presentation of witnesses at trial or the jury's physical acts of deliberating or rendering its verdict.

In her defense, Dewalt conceded that she had fled to Mexico with J.M.D., but attempted to present evidence to the effect that she had acted as a "protective mother." In her unsuccessful suit to terminate Michael's parental rights, Dewalt had alleged that Michael and two adult cousins had repeatedly physically and sexually abused J.M.D. during a June 2001 visitation period, including engaging in "oral sexual activity," "sexual fondling," and "defecation and urination upon the child." Anticipating that Dewalt would attempt to interject similar allegations into her criminal trial, the State filed a pretrial motion in limine. At the time, Dewalt was still charged under the original indictments and had not yet been re-indicted for aggravated kidnapping. The motion requested the district court to prohibit Dewalt, her counsel and witnesses from referencing matters including "[a]ny matters touching upon defenses to prosecution pursuant to Chapter 8 of the Texas Penal Code," "[a]ny matters touching upon justification excluding criminal responsibility pursuant to Chapter 9 of the Texas Penal Code," and "[a]ny matters suggesting or alluding to any physical, emotional or sexual abuse of [J.M.D.]" until authorized by the district court. The State urged specifically that the district court exclude any testimony or references going to a "defensive theory of necessity," *see* Tex. Penal Code Ann. § 9.22 (West 2003), unless and until Dewalt could make a showing, outside of the jury's presence, that she could present legally sufficient evidence to raise each element of the defense. *See* Tex. R. Evid. 104. Unless Dewalt could raise a necessity defense, the State argued, any evidence regarding alleged abuse of J.M.D. would be irrelevant and extremely prejudicial.

11

The district court granted the State's motion in limine but afforded Dewalt the opportunity to demonstrate, in a rule 104 hearing outside the jury's presence before voir dire, that she could present evidence legally sufficient to raise a necessity defense such that evidence probative of that defense would be relevant; otherwise, trial was to proceed under the order in limine. Dewalt availed herself of that opportunity. For purposes of the hearing, the State conceded two of the three elements of a necessity defense—the "desirability and urgency of avoiding the harm clearly outweigh[ed], according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct"; and that a legislative purpose to exclude the justification claimed for the conduct did not otherwise plainly appear. *See id*. § 9.22(2)-(3). The district court also did not require Dewalt to admit to the charges, *see Shaw v. State*, 243 S.W.3d 647, 659 (Tex. Crim. App. 2007), *cert. denied*, 128 S. Ct. 2486 (2008), but focused the hearing solely on whether Dewalt could make a prima facie showing that she had "reasonably believed" her conduct was "immediately necessary to avoid imminent harm" to J.M.D. *See* Tex. Penal Code Ann. § 9.22(1).

Dewalt proffered evidence—including her own account and testimony and records of various health care providers, counselors, and law enforcement and social services personnel who saw J.M.D. in 2001—that J.M.D. had manifested physical and behavioral phenomena purportedly indicative of trauma or sexual abuse after returning from his June 2001 visitation with Michael;[16] that J.M.D. thereafter made outcries alleging abuse and implicating Michael and his cousins; that

---

[16] This included proof that J.M.D. began stuttering for the first time and exhibited fearful or aggressive behavior.

12

J.M.D. had also claimed that Michael and various of his family members[17] had known of the abuse and threatened J.M.D. with guns, swords, or the prospect of never seeing his mother again if he disclosed it; and that Dewalt also knew that some of the professionals who saw the child in 2001 had contemporaneously considered his accounts to be credible and suspected that he had in fact been abused. With this, Dewalt proffered evidence that some of these providers and counselors had recommended, at least at the time, that J.M.D. have no contact with his father and that Michael had been barred by court or military order from having unsupervised visitation with J.M.D. through the end of the custody trial. Dewalt contended that this evidence was legally sufficient to prove that she had "reasonably believed" that fleeing the jurisdiction with J.M.D. was "immediately necessary" to avoid "imminent harm" that Michael would inflict upon the child once he obtained unsupervised custody. The district court disagreed, and ruled that its order in limine concerning evidence probative of a necessity defense would remain in place unless there was "new and different evidence convincing the Court of its relevance." After the original indictments were dismissed and Dewalt was re-indicted for aggravated kidnapping, this and other pretrial rulings were carried over by agreement into the new cause.

During the State's case at trial, Dewalt made several proffers of cross-examination testimony out of the jury's presence. This included testimony from Maxine Vaughn and Jose Uribe that Dewalt had contemporaneously expressed the belief that Michael had sexually abused J.M.D., testimony from Uribe that Dewalt "said she wasn't going to give [J.M.D.] to a sexual predator" and claimed that counselors had agreed with her that abuse had occurred, and testimony from the

---

[17] Including, in one account, the child's grandmother.

investigator who apprehended Dewalt in Mexico that she had asked him, "Wouldn't you have done what I did?"[18] In contrast to her arguments during pretrial hearings, in which she had asserted the evidence was relevant to a necessity defense, Dewalt shifted focus to argue that the evidence was relevant to her "intent" or "motive" to "protect her child," reasoning that her intervening indictment for aggravated kidnapping had placed those matters in issue and rendered necessity "a secondary defense." In Dewalt's view, she was entitled to present this evidence to "rebut" the State's allegations and evidence that she had acted with specific intent to either facilitate commission of interference with child custody or interfere with a governmental function.

The district court disagreed and excluded this evidence. It distinguished the question of Dewalt's motive from the issue of her specific intent. The court also cited the evidence's potential unfairly prejudicial effect on the jury, suggesting that it would amount to a bald plea for jury nullification, as well as reluctance to consume time and distract the jury by re-trying issues in the child-custody case that, in the court's view, had little if any relevance to the criminal case. However, during the State's presentation of Michael, its final witness, the district court ruled that the State had "opened the door" for Dewalt to elicit some evidence going to her "state of mind" in initiating the custody suit and her subsequent actions.[19] The court permitted Dewalt to elicit Michael's

---

[18] Dewalt also proffered testimony from Michael Bowles that some of Dewalt's evidence was excluded from the child-custody trial because her Louisiana-based trial counsel failed to respond to discovery.

[19] The district court permitted this limited cross-examination to address a potentially misleading or one-side portrayal of the custody litigation and Dewalt's motives during the State's direct examination of Michael. Michael testified that Dewalt had a history of being extremely contentious regarding custody arrangements, especially his summer extended visitations, and had disrupted J.M.D.'s prior visits with frequent calls that left the child "curled up on the floor crying" and exclaiming that he hated Michael and his relatives. Out of what he professed was a desire to

14

acknowledgments that she had sued to terminate his parental rights based on allegations that he had "physically endangered" J.M.D. during his 2001 summer visitation and that, while Michael denied the allegations, they were of a nature that would cause a "protective mother" great concern about her child's physical health and well-being if the child had reported them. However, the district court continued to exclude any testimony delving into the specific nature or details of the alleged "physical endangerment."[20]

After the State rested, Dewalt made a proffer of direct testimony outside the jury's presence that was generally similar to the evidence she had presented during the pretrial hearing. This included records and testimony from health care providers who saw J.M.D. in 2001, Dewalt's own testimony, and the testimony and investigative report of an F.B.I. agent who had investigated the abuse allegations. Although ruling that Dewalt's "state of mind" regarding protection of J.M.D. was "fair game" within the parameters it had previously imposed during Michael's cross-examination, the district court excluded the proffered evidence from the guilt-innocence phase of trial.

---

avoid Dewalt's disruptions, Michael admitted that he had misled her about J.M.D.'s whereabouts during the 2001 summer visitation period by telling her that J.M.D. and he would be visiting Michael's parents in Fairfax, Virginia, when, in fact, they and other relatives were planning to travel to Orlando, Florida, for several days for a family wedding. (It was during the Orlando portion of the visit that Dewalt claims the abuse occurred). Then, immediately following these statements, Michael testified that Dewalt subsequently filed a "motion to modify" the custody arrangements and that this proceeding is what led to the trial before Judge Robison.

[20] Dewalt made a proffer of cross-examination testimony in which Michael acknowledged various details of the allegations against him while continuing to deny them.

Following this ruling, Dewalt rested without presenting evidence before the jury. During charge conference, Dewalt requested an instruction on necessity, which the district court denied. During closing argument, Dewalt's counsel conceded that "it would be disingenuous and silly for me to say" that Dewalt had not taken J.M.D. to Mexico, but disputed whether the State had met its burden to prove beyond a reasonable doubt that she had specifically intended either to facilitate the offense of interference with child custody or to interfere with a governmental function. Counsel argued that the State had presented "no evidence whatsoever . . . of what [Dewalt's] actual intent was" and urged the jury to infer from the evidence and "common sense" that instead "her intent was to protect her child."

On the seventh day of trial, the district court submitted the question of Dewalt's guilt or innocence to the jury. After deliberating less than two hours, the jury returned a verdict of guilty. The jury then proceeded to hear over seven additional days of evidence on punishment. In contrast to guilt-innocence, this phase of trial was "wide open," as the district court put it, with respect to evidence of abuse and the extent to which Dewalt's criminal conduct was driven by her perception that J.M.D. would be harmed if returned to his father. To counter Dewalt's mitigation theory that she did the "wrong thing for the right reasons," the State took the position that the abuse had never occurred, but was a product of Dewalt's manipulation of the child to control, gain custody leverage against, or punish her ex-husband; suggestiveness by the first counselor who had interviewed J.M.D.;

16

or simply Dewalt's imagination.[21] If J.M.D. experienced some sort of trauma, the State further suggested, it was attributable to Dewalt's behavior.[22]

The charge required the jury to fix punishment at a term of between 5 and 99 years' incarceration and authorized it to impose a fine not to exceed $10,000. The jury was instructed that it could recommend probation if it sentenced Dewalt to a sentence of 10 years or less. The jury imposed punishment at 5 years' incarceration and a $10,000 fine. It did not recommend probation. Following a hearing on restitution, the district court rendered judgment on the verdict and ordered Dewalt to pay a total of $47,480.73 in restitution. This appeal followed.

## ANALYSIS

### Exclusion of evidence

In her first issue, Dewalt complains that the district court abused its discretion during the guilt-innocence phase in excluding evidence "to explain that every decision she made after the child custody trial was designed to protect her son." She argues both that she proffered evidence legally sufficient to raise a necessity defense to which the evidence was relevant and that

---

[21] In addition to citing inconsistencies among the abuse allegations that are reflected in the medical records and investigative reports, the State also emphasized testimony by Dr. Maureen Adair, a psychiatrist who had been appointed by the court as an independent expert in the child-custody litigation. Dr. Adair opined that she found no objective evidence that J.M.D. had been sexually abused and that psychiatric testing she performed on both parents revealed that Dewalt had difficulty in her perception of reality, along with elevated scales of narcissism and self-centeredness.

[22] The State presented evidence that Dewalt, furious with Michael for misleading her regarding J.M.D.'s whereabouts during the June 2001 visitation, and accompanied by a friend armed with a videotape recorder, confronted Michael at the Corpus Christi airport when his return flight arrived. A confrontation ensued—in J.M.D.'s presence.

17

the excluded evidence was relevant and admissible to "rebut" the State's allegations and evidence of the aggravating factors of her aggravated kidnapping charge. By preventing her from presenting this evidence, Dewalt adds, the district court's error infringed her constitutional right to present a meaningful defense. *See Martinez v. State*, 212 S.W.3d 411, 423 n.4 (Tex. App.—Austin 2006, pet. ref'd) ("Persons accused of crimes are guaranteed a meaningful opportunity to present a complete defense by the Sixth and Fourteenth Amendments to the United States Constitution.") (citing *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).

When reviewing a trial court's decision to admit or exclude evidence, we apply an abuse-of-discretion standard. *Ramos v. State*, 245 S.W.3d 410, 417-18 (Tex. Crim. App. 2008). This includes complaints that the exclusion of evidence infringed the defendant's constitutional right to a meaningful opportunity to present a defense. *See Miller v. State*, 36 S.W.3d 503, 507 (Tex. Crim. App. 2001). The trial court does not abuse its discretion unless its ruling lies "outside the zone of reasonable disagreement." *Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007).

We begin with Dewalt's argument regarding her "specific intent," as it relates to Dewalt's culpability for aggravated kidnapping and thus logically precedes her contentions regarding justification by necessity. *See Shaw*, 243 S.W.3d at 659. Dewalt asserts that she was entitled to present evidence of "circumstances surrounding [J.M.D.'s] allegations . . . and the resulting need to protect her son, that led her to act" because it was relevant and admissible to "rebut" the State's allegations and evidence that "she had acted with the intent of interfering with

18

child custody or a governmental function." We cannot conclude that the district court abused its discretion in concluding otherwise.

Under the indictment, as well as the jury charge, the State was required to prove that Dewalt "intentionally or knowingly" "abducted" J.M.D. (which in itself required the State to prove that Dewalt "restrained" the child by moving him without the consent of Michael or his guardian ad litem with the specific intent "to prevent his liberation by secreting and holding [J.M.D.] in a place where he was not likely to be found") with the further specific intent either "to facilitate the commission of a felony, to wit: interference with child custody" (which was defined in the charge in a manner consistent with the penal code[23]) or "to interfere with the

---

[23] The jury was instructed that interference with child custody means:

(a)   the person takes or retains a child younger than 18 years when the person:

   (1)   knows that the person's taking or retention violates the express terms of a judgment or order, including a temporary order, of a court disposing of the child's custody; or

   (2)   has not been awarded custody of the child by a court of competent jurisdiction, knows that a suit for divorce or a civil suit or application for habeas corpus to dispose of the child's custody has been filed, and takes the child out of the geographic area of the counties composing the judicial district if the court is a district court or the county if the court is a statutory county court, without the permission of the court and with the intent to deprive the court of authority over the child.

(b)   A noncustodial parent commits an offense if, with the intent to interfere with the lawful custody of a child younger than 18 years, the noncustodial parent knowingly entices or persuades the child to leave the custody of the custodial parent, guardian, or person standing in the stead of the custodial parent or guardian of the child.

This definition tracks the penal code. *See* Tex. Penal Code Ann. § 25.03(a)-(b).

19

performance of a governmental function, to wit: a Comal County District Court Jury Trial, the Jury's Verdict and/or the interim orders of the District Court Judge." *See Laster v. State*, 275 S.W.3d 512, 521 (Tex. Crim. App. 2009). The penal code provides, and the jury was instructed, that "[a] person acts intentionally, or with intent, with respect to the nature of [her] conduct or to a result of [her] conduct when it is [her] conscious objective or desire to engage in the conduct or cause the result." Tex. Penal Code Ann. § 6.03(a) (West 2003). In sum, the State was required to prove that Dewalt had the conscious objective or desire to interfere with Michael's child custody rights under Judge Robison's order and/or the judicial proceedings declaring those rights when restraining J.M.D. with the conscious mental objective or desire to prevent his liberation by secreting or holding him.

As the district court suggested, Dewalt confuses a question of her motive—whether and why she perceived a "need to protect her son" that incited her to take these actions—with one of the specific intent elements the State had to prove—whether, when so acting, she had the conscious objective or desire to interfere with Michael's child custody rights and/or the judicial proceedings declaring those rights. *See, e.g.*, Black's Law Dictionary 810 (6th ed. 1990) ("Intent and motive should not be confused. Motive is what prompts a person to act, or fail to act. Intent refers only to a state of mind with which the act is done or committed."). And, contrary to Dewalt's assertions, proof that she had a motive to protect J.M.D. has little, if any, probative value toward

The court also instructed the jury that Dewalt had the right under her final divorce decree to determine J.M.D.'s residence "until changed by Order of Judge Robison on October 25, 2002, at 9:40 p.m." at which time Michael "was appointed sole managing conservator with the right to determine the residence of [J.M.D.] and that right continues to this date."

20

negating the existence of a conscious objective or desire on her part to interfere with Michael's child custody rights and/or the judicial proceedings declaring those rights. The two are not mutually exclusive and, if anything, proof of Dewalt's motive would instead be circumstantial evidence tending to support the State's allegations that she acted with such a conscious objective or desire. Indeed, proof of such a motive would tend to confirm that infringing Michael's custody rights and countermanding the judicial process was the whole point of Dewalt's actions.

Even if proof of Dewalt's motive had some relevance under her theory, the district court did not abuse its discretion in excluding much of the evidence that Dewalt sought to present to prove her motive. As previously explained, the district court did not wholly prevent Dewalt from presenting evidence that she "acted . . . to protect her son," but ultimately ruled that Dewalt's motive was "fair game" to the extent of evidence that she had alleged Michael had "physically endangered" J.M.D. in a manner that would cause a "protective mother" great concern about her child's physical health and well-being. However, the district court did continue to exclude evidence detailing the nature of the alleged "physical endangerment"—i.e., that the child had been *sexually* abused and threatened—graphic accounts of J.M.D.'s alleged outcries and physical or behavioral phenomena, and testimony or records of health care providers or investigators bolstering Dewalt's allegations. It is this evidence that is the subject of Dewalt's complaint on appeal.

"The Constitution leaves to the [trial] judges . . . 'wide latitude' to exclude evidence" that, among other things, "poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" *Crane*, 476 U.S. at 689-90 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). Rule of evidence 403 provides that otherwise relevant evidence "may be excluded if its probative

21

value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403. In contrast to what is at best limited probative value in controverting the State's allegations of specific intent, the factors weighing against admission of Dewalt's evidence going to her professed motive to "protect her son"—especially sensational details of the alleged abuse—were high. Evidence of sexual abuse, especially allegations of such abuse perpetrated by a parent on a child, is extremely prejudicial. *See Wheeler v. State*, 67 S.W.3d 879, 889 (Tex. Crim. App. 2002); *Kirby v. State*, 208 S.W.3d 568, 572-75 (Tex. App.—Austin 2006, no pet.); *see also Richardson v. Green*, 677 S.W.2d 497, 501 (Tex. 1984) (reversing order terminating father's parental rights after concluding that trial court erred in admitting inflammatory and "highly prejudicial" hearsay evidence pertaining to mother's allegations that father sexually abused their child). As the district court aptly observed during trial, this evidence would have interjected into trial an emotionally charged set of collateral issues with great potential to confuse and mislead the jury. And once those issues were placed before the jury, the court also noted, it would be necessary to essentially re-try the issues in the child-custody case, requiring a week or more of additional testimony (as ultimately borne out in the trial's punishment phase, in which that evidence was admitted), and further confusing and distracting the jury from the issues that properly control under the applicable law. The district court did not abuse its discretion in finding the evidence substantially more prejudicial than probative, and excluding it on that basis.

Nor did the district court abuse its discretion in excluding Dewalt's evidence to the extent offered as proof of a necessity defense. The admissibility of the evidence under that

theory turns on the district court's determinations that Dewalt did not present evidence outside the jury's presence sufficient to support or "raise" a necessity defense so as to ultimately be entitled to submission of the defense to the jury. A defense is supported or raised by the evidence "if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that the element is true." *See Shaw*, 243 S.W.3d at 657-58. "In determining whether a defense is thus supported, a court must rely on its own judgment, formed in the light of common sense and experience, as to the limits of rational inference from the facts proven." *Id.* at 658. If a defense is supported by the evidence, then the defendant is entitled to an instruction on that defense, even if the evidence supporting the defense is weak or contradicted, and even if the trial court is of the opinion that the evidence is not credible." *Id.* "But the evidence must be such that it will support a rational jury's finding as to each element of the defense." *Id.* We review the evidence in the light most favorable to the defense and determine whether a rational juror could accept it as sufficient to prove each defensive element. *See Stefanoff v. State*, 78 S.W.3d 496, 499-500 (Tex. App.—Austin 2002, pet. ref'd). Whether a defense is supported by the evidence is a sufficiency question reviewable on appeal as a question of law. *Shaw*, 243 S.W.3d at 658.

The necessity defense is codified in chapter 9 of the penal code. Under chapter 9, "It is a defense to prosecution that the conduct in question is justified under this chapter." Tex. Penal Code Ann. § 9.02. Necessity is one justification for conduct under chapter 9. *Id*. § 9.22. For conduct to be justified by necessity, section 9.22 requires proof of each of the following elements:

(1)     the actor reasonably believes the conduct is immediately necessary to avoid imminent harm;

23

(2)      the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and

(3)      a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.

*Id.* In addition to these explicit statutory elements, the Court of Criminal Appeals has held—based on the text of the penal code and the theory that necessity is a "true" defense that justifies or excuses otherwise-criminal conduct rather than merely contravening an element of the offense—that a defendant must present evidence "essentially admit[ting] to every element of the offense including the culpable mental state" in order to raise a necessity defense. *Shaw*, 243 S.W.3d at 659. Assuming without deciding that Dewalt met the other requirements for raising a necessity defense,[24] we conclude that the district court did not err in determining that, as a matter of law, she failed to present legally sufficient evidence that she "reasonably believed" kidnapping J.M.D. was "immediately necessary" to avoid "imminent harm."

As proof of this element, Dewalt emphasizes proffered evidence to the effect that she sincerely believed J.M.D. would be immediately harmed if ever left with Michael unsupervised.

---

[24] On appeal, the State joins issue with respect to only the first of the three statutory elements of necessity and also questions whether Dewalt presented evidence conceding that she committed aggravated kidnapping. As noted, Dewalt contested at trial whether the State had proven her specific intent to interfere with child custody or a governmental function. In contending on appeal that she admitted the offense, Dewalt cites her testimony during the pretrial hearing, in which she admitted that she took J.M.D. to Mexico; her counsel's similar concession during closing argument; and testimony she proffered at trial that she "engaged in the proscribed conduct because as a mother she was compelled to protect her child [J.M.D.] from what she reasonably believed to be a threat of imminent death or serious bodily injury to herself or [J.M.D.]" We express no opinion as to whether this evidence sufficiently "admits" each element of the charged offense of aggravated kidnapping.

However, even a defendant's sincere belief that his or her conduct is immediately necessary to avoid imminent harm is unreasonable as a matter of law if the undisputed facts demonstrate a complete absence of "immediate necessity" or "imminent harm" as those concepts are defined in the law. *See Washington v. State*, 152 S.W.3d 209, 212 (Tex. App.—Amarillo 2004, no pet.); *Arnwine v. State*, 20 S.W.3d 155, 159 (Tex. App.—Texarkana 2000, no pet.). Consequently, "Section 9.22(1) requires the defendant to first bring forward evidence of a specific imminent harm." *Stefanoff*, 78 S.W.3d at 500. "'Imminent' means something that is immediate, something that is going to happen now." *Id.* at 501. Thus, "imminent harm," as this Court has previously explained, "contemplates a reaction to circumstances that must be the result of a 'split-second decision [made] without time to consider the law," *id*. (quoting *Smith v. State*, 874 S.W.2d 269, 272-73 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd), "an immediate, non-deliberative action made without hesitation or thought of the legal consequence." *Id*. *Accord Smith*, 874 S.W.2d at 273 ("An 'imminent harm' occurs when there is an emergency situation, and it is 'immediately necessary' to avoid that harm when a split-second decision is required without time to consider the law.").

As proof of "imminent harm," Dewalt cites her proffered evidence that she had reason to believe J.M.D. had been abused in June 2001, that he had been physically threatened not to divulge the abuse, and that some professionals who saw J.M.D. in 2001 had contemporaneously found J.M.D.'s accounts credible and opined (at least at the time) that it would be detrimental to him to have contact with his father. She adds that Michael had not been permitted unsupervised visitation with J.M.D. between the time the abuse allegations surfaced through the custody trial. This evidence, Dewalt argues, supports a finding that she reasonably believed "some harm [was]

25

going to befall [J.M.D.] the split second he was turned over to his father in the courtroom," that the child "would be traumatized by being unsupervised with his father, that he would face immediate physical and sexual 'punishment' for telling the 'secret,'" and that she "would be helpless to prevent the harm." To the contrary, undisputed evidence establishes the absence of "imminent harm" as a matter of law.

Dewalt asserts that she faced "imminent harm" beginning when the jury rendered its verdict awarding custody of J.M.D. to Michael. At that moment, it is undisputed that the child was in San Antonio, a half-hour or more drive from the courthouse in New Braunfels where his parents were. Whatever threat of harm that Michael could have presented to J.M.D. from Dewalt's perspective was not "something that [was] going to happen now." *Stefanoff*, 78 S.W.3d at 501; *see Kenny v. State*, 292 S.W.3d 89, 101 (Tex. App.—Houston [14th Dist.] 2007, pet. dism'd) (no evidence of "immediate necessity" or "imminent harm" where complainant and defendant "had argued for at least five minutes" before defendant tied complainant's wrists together ostensibly to prevent her from driving drunk).[25] Moreover, any threat of harm Michael could have presented at the moment the jury rendered its verdict grew only less "imminent" as Dewalt's abduction of J.M.D. continued during the hours and miles of Dewalt's flight to the Mexican border—not to mention during the months and years in which Dewalt remained with the child in Mexico. *See Schier*

---

[25] *Cf. Vasquez v. State*, 830 S.W.2d 948, 950-51 (Tex. Crim. App. 1992) (error to refuse necessity instruction where defendant testified that he was unlawfully carrying firearm while fleeing from kidnappers who would shoot him if they saw him); *Pennington v. State*, 54 S.W.3d 852, 858 (Tex. App.—Fort Worth 2001, no pet.) (error to refuse necessity instruction in drug-possession case where defendant presented evidence she had fled house with drugs less than ten minutes earlier to prevent child in same home from viewing them).

*v. State*, 60 S.W.3d 340, 343-44 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (in interference with child custody prosecution of defendant who picked up child for weekend visitation and kept her for over eight months, evidence that child had previously been abused by mother and that mother abused drugs and alcohol, while probative of a "deplorable" and potentially harmful home environment for the child, did not "make[] it any more or less likely that there was an emergency situation 'on the point of happening,'which required appellant to act *immediately*"); *Smith*, 874 S.W.2d at 273 (in interference with child custody prosecution, imminent harm negated because "appellant had plenty of time to consider his options and the penalties he would receive if he decided to violate the court's order" when children were in defendant's possession almost 24 hours before their flight and defendant thereafter had "concealed the location of his children for over seven years. We cannot hold it was immediately necessary for him to keep them out of the United States for that long, regardless of what danger they were in before they left"); *see also Sanders v. State*, 605 S.W.2d 612, 614 (Tex. Crim. App. 1980) (observing that "[a]bduction . . . is a continuing offense, "[t]he restraint in abduction does not necessarily 'occur' only at one specific time," and that "[t]here is no time limit for abduction"). Furthermore, while Dewalt claims that she did not firmly decide to flee to Mexico with J.M.D. until the jury rendered its verdict, it remains undisputed that she had anticipated the jury could or would award custody to Michael and began planning the flight even before the two-week trial began. *See Contreras v. State*, 73 S.W.3d 314, 318-19 (Tex. App.—Amarillo 2001, no pet.) (no evidence of "imminent harm" where there was undisputed evidence of prior planning to stab decedent and stabbing occurred over one hour after decedent allegedly sexually abused defendant).

27

In short, these undisputed facts negate, as a matter of law, the sort of "emergency situation" necessitating a "split-second decision made without time to consider the law" that distinguishes "imminent harm" and can raise a necessity defense. Instead, the evidence reflects a calculated decision by Dewalt—before, during, and continuing for years after her trial—to ignore and avoid the law. Consequently, the district court did not err in holding that Dewalt could not raise a necessity defense and did not abuse its discretion in excluding evidence Dewalt sought to present to prove that defense.

Assuming, as we must, that Dewalt sincerely believed Michael would harm J.M.D. once the child was returned to him, the prospect of complying with the verdict and judgment awarding custody to Michael would have been agonizing for any parent. However, the fact that Dewalt might have strongly disagreed with the jury's verdict in her child-custody litigation does not, in itself, defeat or excuse her criminal responsibility for aggravated kidnapping under Texas law.

The district court did not abuse its discretion in ensuring that the evidence at trial remained focused on the issues that were relevant to Dewalt's criminal responsibility under Texas law. We overrule Dewalt's first issue.

**Voir dire**

In the alternative, in her second issue, Dewalt asserts that the district court abused its discretion during voir dire by not allowing her to ask questions of the venire related to J.M.D.'s alleged abuse and her reasons for kidnapping him. Even assuming this evidence was properly excluded from the guilt-innocence phase of trial, Dewalt argues, she was entitled to inquire into these

28

matters because the evidence was ultimately admitted during punishment phase. The State responds that Dewalt failed to preserve error on this issue.

When an appellant challenges a trial court's limitation of her voir dire, the reviewing court analyzes this challenge under an abuse-of-discretion standard, "the focus of which is whether the appellant proffered a proper question concerning a proper area of inquiry." *Caldwell v. State*, 818 S.W.2d 790, 793 (Tex. Crim. App. 1991), *overruled on other grounds*, *Castillo v. State*, 913 S.W.2d 529 (Tex. Crim. App. 1995). The propriety of a particular question is left to a trial court's discretion, and its ruling will not be disturbed on appeal absent an abuse of discretion. *Sells v. State*, 121 S.W.3d 748, 755 (Tex. Crim. App. 2003). A trial court's discretion is abused when it prohibits a proper question about a proper area of inquiry. *Id*. at 755-56. A "proper" question is one which seeks to discover a veniremember's views on an issue applicable to the case. *Rhoades v. State*, 934 S.W.2d 113, 118 (Tex. Crim. App. 1996).

In order to decide whether the trial court abused its discretion in prohibiting a voir dire question, the reviewing court "must first determine if the appellant proffered a proper question"—one which is both "appropriately phrased and relevant." *Caldwell*, 818 S.W.2d at 793, 794. If an appellant does not actually frame a question to the trial court, nothing is preserved for review. *Caldwell*, 818 S.W.2d at 794. Similarly, an appellant does not preserve error by informing the trial court of the general subject area from which she wishes to propound questions. *Sells*, 121 S.W.3d at 756; *Caldwell*, 818 S.W.2d at 794. "Potentially, a wide range of specific questions—both proper and improper—could [be] asked within [a proper subject] area." *Caldwell*, 818 S.W.2d at 794. For this reason, in order to preserve error as to the improper limitation of

voir dire, an appellant "must show that he was prevented from asking *particular* questions that were proper." *See Sells*, 121 S.W.3d at 756 (emphasis in original). "That the trial court generally disapproved of an area of inquiry from which proper questions could have been formulated is not enough because the trial court might have allowed the proper question had it been submitted for the court's consideration." *Id.*

In this case, the record does not reflect any specific questions that Dewalt sought to ask the venire but was prohibited from doing so. Nor does Dewalt refer in her brief to any specific questions that she was prevented from asking. Because Dewalt did not show that she was prevented from asking a specific proper question, she failed to preserve error.

We overrule Dewalt's second issue.

**Venue**

In her third issue, Dewalt contends that the State failed to present legally sufficient evidence of venue in Comal County. "The State need prove venue only by a preponderance of the evidence." *Murphy v. State*, 112 S.W.3d 592, 604 (Tex. Crim. App. 2003) (citing Tex. Code Crim. Proc. Ann. art. 13.17 (West 2005)). Venue may be proven by circumstantial as well as direct evidence. *Stanley v. State*, 471 S.W.2d 72, 77 (Tex. Crim. App. 1971); *Bollinger v. State*, 224 S.W.3d 768, 776 (Tex. App.—Eastland 2007, pet. ref'd). The trier of fact may make reasonable inferences from the evidence to decide the issue of venue. *Bordman v. State*, 56 S.W.3d 63, 70 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). Venue will stand if the evidence is sufficient under any one of the venue provisions on which the jury was instructed. *Murphy*, 112 S.W.3d at 605. When reviewing whether there is legally sufficient evidence of venue, "we view all

the evidence in the light most favorable to the verdict and then determine whether a rational trier of fact could have found venue was proper by a preponderance of the evidence." *Gabriel v. State*, 290 S.W.3d 426, 435 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). "Thus, if there is evidence establishing venue by a preponderance, we are not authorized to reverse the judgment on sufficiency of the evidence grounds." *Id*. at 436.

The district court instructed the jury regarding the following venue provisions:

> You are further charged as the law in this case that the 'venue' for the trial of the offense of Aggravated Kidnapping is in the county in which the offense was committed, or in any county through, into or out of which the person kidnapped may have been taken.
>
> If an offense has been committed within the state and it cannot readily be determined within which county or counties the commission took place, trial may be held in the county in which the defendant resides, in the county in which she is apprehended, or in the county to which she is extradited.

The first instruction submitted venue under article 13.12 of the code of criminal procedure. *See* Tex. Code Crim. Proc. Ann. art. 13.12 (West 2005) ("Venue for . . . kidnapping is in either the county in which the offense is committed, or in any county through, into or out of which the person . . . kidnapped may have been taken"). The second submitted venue under article 13.19. *See* Tex. Code Crim. Proc. Ann. art. 13.19 (West 2005) ("If an offense has been committed within the state and it cannot readily be determined within which county or counties the commission took place, trial may be held in the county in which the defendant resides, in the county in which she is apprehended, or in the county to which she is extradited."). Dewalt argues that the State presented

no evidence that the offense was committed in Comal County or that J.M.D. was thereafter taken through Comal County, and that the evidence conclusively establishes that it was instead committed in Bexar County—the county where the Kearnses' and Maxine Vaughn's houses are located—or one of the counties through which J.M.D. was taken between San Antonio and the Mexican border.

As noted, the jury charge, consistent with the indictment and the penal code, submitted whether Dewalt (1) "intentionally or knowingly" (2) "abducted" J.M.D. (3) with the specific intent either "to facilitate the commission of a felony, to wit: interference with child custody" (which was defined in the charge in a manner consistent with the penal code) or "to interfere with the performance of a governmental function, to wit: a Comal County District Court Jury Trial, the Jury's Verdict and/or the interim orders of the District Court Judge." To find that Dewalt "abducted" J.M.D., the jury was to find two elements: (1) Dewalt "restrain[ed] [J.M.D.] . . . so as to interfere substantially with his liberty, by moving him from one place to another, and the said [J.M.D.] was a child younger than 14 years of age whose parent and managing conservator—namely: Michael Dewalt or whose guardian—namely: Michael D. Bowles had not acquiesced in the movement of the child"; and (2) Dewalt restrained J.M.D. "with intent to prevent his liberation by secreting and holding [J.M.D.] in a place where he was not likely to be found." The charge also defined "abduct" and "restrain" in accordance with the penal code:

> "Abduct" means to restrain a person with intent to prevent his liberation by secreting or holding him in a place where he is not likely to be found.

> "Restrain" means to restrict a person's movements without consent, so as to interfere substantially with his liberty, by moving him from one place to another or by confining him. Restraint is "without consent" if it is accomplished by any means, including acquiescence of the victim, if he is a child less than 14 years of age and the

32

parent, guardian, or person or institution acting in loco parentis has not acquiesced in the movement or confinement.

*See* Tex. Penal Code Ann. § 20.01(a)(1), (2). The jury was also instructed regarding the law of parties.[26]

Dewalt argues that the evidence conclusively establishes that the offense could not have occurred in Comal County because the "restraint" of J.M.D. did not begin until Judge Robison ordered that Michael was appointed sole managing conservator. As noted, the evidence was undisputed that until Judge Robison ordered that Michael was appointed sole managing conservator, Dewalt continued to possess the right under the divorce decree to determine J.M.D.'s residency. In fact, the district court instructed the jury that:

In the final decree of divorce between Michael Dewalt and Suzanne Dewalt, Suzanne Dewalt had the right to determine the residence of [J.M.D.] and that right continued until changed by Order of Judge Robison on October 25, 2002, at 9:40 p.m. At that time, Judge Robison ordered that Michael Dewalt was appointed

---

[26] The jury was instructed:

A person is criminally responsible as an "individual" if the results would not have occurred but for her conduct.

A person is criminally responsible as a "'party" to an offense if the offense is committed by his or her own conduct, or by the conduct of another for whom she is criminally responsible, or by both. Each party to an offense may be charged with the commission of the offense.

Mere presence alone will not make a person a party to an offense. A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, she solicits, encourages, directs, aids or attempts to aid the other person to commit the offense.

33

> sole managing conservator with the right to determine the residence of [J.M.D.] and that right continues to this date.

At 9:40 p.m. on October 25, Dewalt emphasizes, it is undisputed that J.M.D. was already in Bexar County, at Maxine Vaughn's house, and that he was not taken through Comal County on his subsequent path to Mexico. As for J.M.D.'s movement from Comal County to Bexar County prior to that time, Dewalt argues that because she had the right under the divorce decree to determine J.M.D.'s residence, she had power to consent to that movement such that J.M.D. was not "restrained" at that time as a matter of law. *See* Tex. Penal Code Ann. § 20.01(1).

In response, the State does not seem to dispute that J.M.D. was not "restrained" until 9:40 p.m. on October 25, when the child was physically in Bexar County, but urges that the evidence nonetheless enabled the jury to find the aggravated kidnapping offense occurred in Comal County. As the State emphasizes, the charge, consistent with the penal code, instructed the jury that J.M.D.'s "restraint" (i.e., moving him from place to place *without the acquiescence of* Michael or Bowles, the guardian ad litem) could be accomplished by "any means." The State urges that its undisputed evidence that Dewalt, while still in the Comal County courthouse, took action to mislead Michael, Bowles, and Judge Robison regarding J.M.D.'s whereabouts supported the jury's finding that Dewalt had committed a "restraint" of the child in Comal County through the means of deceiving those who had legal custody and right to control the child and consent on his behalf.[27]

---

[27] In this regard, the State observes that the legislature expressly comprehended that the "means" by which a "restraint" can be accomplished can include "deception." *See* Tex. Penal Code Ann. § 20.01(1)(A).

The State also argues that under the law of parties instruction, the jury could have found

Additionally, the State observes that "abduction" consists of "restraint" (the actus reus) with the specific intent to prevent liberation by secreting or holding the victim in a place where he is not likely to be found (the mens rea), and that the offense of kidnapping is legally completed when the defendant accomplishes a restraint of the victim and, at any time during the restraint, forms the requisite specific intent. *See Laster*, 275 S.W.3d at 521; *Mason v. State*, 905 S.W.2d 570, 575 (Tex. Crim. App. 1995). As the State urges, there was considerable evidence that Dewalt, while still in Comal County, had formed the specific intent to prevent J.M.D.'s liberation through the means of secreting and holding where he was unlikely to be found. *See Laster*, 275 S.W.3d at 521. The same is true of Dewalt's specific intent regarding the aggravating elements, the State adds.

We agree with the State that the evidence was legally sufficient to support the jury's finding, by a preponderance of the evidence, that Dewalt's aggravated kidnapping offense occurred in Comal County, such that venue in that county was proper under article 13.12. In the alternative, even if the evidence was not sufficient to prove venue in Comal County, on this record we would not find the error to be reversible.

Historically, when venue has not been proven as alleged, the conviction has been reversed and a judgment of acquittal rendered. *See Black v. State*, 645 S.W.2d 789, 791 (Tex. Crim. App. 1983) ("When venue is made an issue in the trial court, failure to prove venue in the county of prosecution constitutes reversible error."). However, in 2005, this Court observed that *Black* was

that the restraint began to be accomplished in both Bexar County, where J.M.D. was physically being held, as well as Comal County, where there was evidence Dewalt was soliciting, encouraging, and directing her cohorts' movement and confinement of J.M.D. and aiding those actions through such means as misleading Judge Robison and others regarding J.M.D.'s location. We need not reach that contention.

decided prior to the adoption of the Texas Rules of Appellate Procedure and its provisions regarding harmless-error analysis. *State v. Blankenship*, 170 S.W.3d 676, 682 (Tex. App.—Austin 2005, pet. ref'd). This Court then held that failure to prove venue was non-constitutional error that should not result in reversal unless the error affected the defendant's substantial rights. *Id*. at 683; *see also Schemm v. State*, 228 S.W.3d 844, 845 (Tex. App.—Austin 2007, pet. ref'd) ("Reversible error *may* result from the failure to prove venue as set forth in the charging instrument.") (emphasis added).

On this record, we cannot conclude that venue in Comal County violated Dewalt's substantial rights. A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *Blankenship*, 170 S.W.3d at 683. The issue of venue controlled only the geographic location where the case was to be tried; it did not impact the district court's jurisdiction, nor was it an element of any charge or potential defense in this case. *See Thompson v. State*, 244 S.W.3d 357, 365 (Tex. App.—Tyler 2006, pet. dism'd). Any error with regard to venue did not in itself alter the manner in which the charged offense was submitted to the jury or the jury's decision-making process. *See id.*

Further, venue in Comal County was consistent with the underlying legislative purposes of the venue statutes. Venue statutes function to ensure that jurors have a natural interest in the case because it touched their community; to ensure that prosecutions are initiated in counties that have some factual connection to the case, thus minimizing inconvenience to parties and witnesses; to aid predictability in judicial caseloads, and to prevent forum-shopping by the State. George E. Dix & Robert O. Dawson, *Texas Practice: Criminal Practice and Procedure* § 2.02 (2001). In this case, the criminal acts in question had a substantial, indeed pervasive, connection

with Comal County. Both Dewalt and J.M.D. resided in Comal County at the time of the custody trial and subsequent flight to Mexico. Many of the relevant events occurred in Comal County. Nearly all of the witnesses resided in Comal County. Finally, and perhaps most significantly, the judicial orders and processes that Dewalt sought to defeat or avoid were those of a Comal County District Court. Dewalt has not asserted that she was physically inconvenienced by having the trial in Comal County. Nor is this a case where the State has forum-shopped by bringing a prosecution in a venue that has only a tenuous connection to the underlying facts. There is no indication that the State deliberately sought to taint the process by bringing the prosecution in Comal County, as opposed to exercising prosecutorial discretion regarding an offense centered on that locality. We also observe that the legislature has provided a venue provision that, if the jury had been instructed upon it, clearly would have made venue proper in Comal County. *See* Tex. Code Crim. Proc. Ann. art. 13.01 (West 2005) (providing that offenses committed "wholly or in part outside this State" "may be prosecuted . . . in any county in which an element of the offense occurs").

While Dewalt was critical at trial of the State's exercise of prosecutorial discretion, she does not assert that she received an unfair trial by virtue of the Comal County venue or that the jury and judge were anything but impartial. *See* Tex. Code Crim. Proc. Ann. art. 31.03 (West 2006) (providing for change of venue in cases where defendant could not receive fair trial). Finally, we observe there was overwhelming evidence of Dewalt's guilt for aggravated kidnapping.

We overrule Dewalt's third issue.

**Intent to facilitate interference with child custody as an aggravating factor**

In her fourth issue, Dewalt asserts that "lesser-included offenses cannot serve as aggravating factors," that the offense of interference with child custody is a lesser-included offense of kidnapping, and that for these reasons, Dewalt "was entitled to an instructed verdict of not guilty under both paragraphs of the indictment." Dewalt urges that using this "lesser-included offense" to "bootstrap" the kidnapping allegations into an aggravated charge violates due process and double jeopardy. In support for that proposition, Dewalt draws an analogy to the rule that a defendant's intent to commit an aggravated assault cannot be used to elevate a murder to felony murder because aggravated assault is a lesser-included offense of murder. *See Garrett v. State*, 573 S.W.2d 543, 545 (Tex. Crim. App. 1978). Assuming without deciding the validity of Dewalt's assertions that interference with child custody, if a lesser-included offense of kidnapping, cannot be used to aggravate the kidnapping charge, Dewalt has not shown reversible error.[28]

We first observe that, as the offense is defined in both the indictment and jury charge, the jury could have convicted Dewalt of aggravated kidnapping without finding that she acted with intent to commit interference with child custody—it could have found instead that she acted with intent to interfere with the performance of a governmental function. As previously explained, the two alternative aggravating factors were submitted in the disjunctive; consequently, Dewalt's conviction for aggravated kidnapping could stand based solely on the finding that Dewalt acted with intent to interfere with a governmental function. Dewalt has not challenged the sufficiency of the

---

[28] We note that this is not a case where Dewalt has been convicted and punished for both offenses. Nor did Dewalt seek a lesser-included offense instruction.

evidence supporting this finding. We also note that in the instructed-verdict motion through which Dewalt raised this complaint below, Dewalt appears to challenge only the first paragraph of the indictment, which alleged that Dewalt committed kidnapping with intent to facilitate the offense of interference with child custody, and not to the second paragraph alleging interference with a governmental function.[29] By failing to challenge the second paragraph of the indictment below, Dewalt waived that contention. *See* Tex. R. App. P. 33.1(a)(1).

Moreover, we disagree with Dewalt that interference with child custody is a lesser-included offense of kidnapping under the indictment here. An offense is a lesser-included offense if it is established by proof of the same or less than all the facts required to establish the commission of the offense charged. Tex. Code Crim. Proc. Ann. art. 37.09(1) (West 2006). "[T]he facts required to establish the commission of the charged offense" under this analysis refers to the facts as alleged in the charging instrument. *Hall v. State*, 283 S.W.3d 137, 157 (Tex. App.—Austin 2008, pet. denied) (citing *Hall v. State*, 225 S.W.3d 524, 534-35 (Tex. Crim. App. 2007)). "Therefore, 'the determination of whether a lesser-included offense is involved should be made by comparing the elements of the greater offense, as the State pled it in the indictment, with the elements of the statute that defines the lesser offense.'" *Id*. (quoting *Peavey v. State*, 248 S.W.3d 455, 467 (Tex. App.—Austin 2008, pet. ref'd)). This presents a question of law. *Id*. (citing *Hall*, 225 S.W.3d at 535).

---

[29] Similarly, Dewalt had also moved unsuccessfully to quash the indictment on the ground that "Interference With Child Custody, while not a lesser-included offense of Kidnapping, is not a valid felony for the enhancement of Kidnapping to Aggravated Kidnapping" because the elements of kidnapping and interference with child custody, "particularly as they are applied to the facts of this case, are almost identical."

As noted, to prove the elements of kidnapping under Dewalt's indictment, the State was required to prove that Dewalt (1) intentionally or knowingly (2) "abducted" J.M.D. by (a) restricting his movements so as to interfere substantially with his liberty by moving him from one place to another without Michael's consent or that of his guardian ad litem, (b) with the intent to prevent his liberation by secreting and holding him in a place where he was not likely to be found. Also as previously noted, the penal code provides, and the jury was instructed, that a person can commit the offense of interference with child custody in two basic ways:

(a)     the person takes or retains a child younger than 18 years when the person:

    (1)     knows that the person's taking or retention violates the express terms of a judgment or order, including a temporary order, of a court disposing of the child's custody; or

    (2)     has not been awarded custody of the child by a court of competent jurisdiction, knows that a suit for divorce or a civil suit or application for habeas corpus to dispose of the child's custody has been filed, and takes the child out of the geographic area of the counties composing the judicial district if the court is a district court or the county if the court is a statutory county court, without the permission of the court and with the intent to deprive the court of authority over the child.

(b)     A noncustodial parent commits an offense if, with the intent to interfere with the lawful custody of a child younger than 18 years, the noncustodial parent knowingly entices or persuades the child to leave the custody of the custodial parent, guardian, or person standing in the stead of the custodial parent or guardian of the child.

Tex. Penal Code Ann. § 25.03(a)-(b) (West Supp. 2008). Proof of kidnapping, as alleged in the indictment, would not subsume the elements of interference with child custody under either paragraph (a) or (b). For example, the State could prove kidnapping without proving either the

40

mens rea required by paragraph (a) (knowing that the taking or retention violates the express terms of a judgment or order disposing of the child's custody) or the knowing enticement or persuasion required by paragraph (b).[30]  Consequently, the offense of interference with child custody would not be established by proof of the same or less than all the facts required to establish the commission of the charged aggravated-kidnapping offense.  *See Briggs v. State*, 807 S.W.2d 648, 652 (Tex. App.—Houston [1st Dist.] 1991, pet. ref'd) (holding that offense of enticing child is not lesser-included offense of interference with child custody); *see also Doyle v. State*, No. 07-03-0024-CR, 2004 Tex. App. LEXIS 10716, at *12-14 (Tex. App.—Amarillo Nov. 29, 2004, pet. ref'd) (not designated for publication) (holding that offense of enticing child is not lesser-included offense of aggravated kidnapping).

We overrule Dewalt's fourth issue.

## CONCLUSION

Having overruled each of Dewalt's issues, we affirm the judgment of the district court.

---

[30]  In her reply brief, Dewalt analyzes this issue by comparing the statutory elements of interference with child custody to the elements of *aggravated* kidnapping as alleged in the indictment—including the aggravating factor of intent to facilitate the offense of interference with child custody.  Dewalt's analysis is thus circular—she suggests that interference with child custody cannot be used to aggravate a kidnapping charge because the elements of *aggravated* kidnapping, including the aggravating factor of intent to commit interference with child custody, subsumes proof of interference with child custody.  This analysis misses or obscures the point of Dewalt's own argument, which is that interference with child custody is a lesser-included offense of *kidnapping* and, for that reason, cannot be used to aggravate that offense.

41

_____

Bob Pemberton, Justice

Before Justices Patterson, Puryear and Pemberton

Affirmed

Filed:   January 22, 2010

Publish