

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00444-CR
### NO. 02-16-00445-CR

JAIME ALVAREZ                                                                   APPELLANT

V.

THE STATE OF TEXAS                                                                   STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY
TRIAL COURT NO. 1419571D, 1422028D

----------

## MEMORANDUM OPINION[1]

----------

A jury convicted Appellant Jaime Alvarez of two counts of unlawful possession of a firearm by a felon, charged separately, and the trial court sentenced him to six years' confinement for each offense. *See* Tex. Penal Code Ann. §§ 12.34, 46.04(a)(1), (e) (West 2011). In one issue, Appellant contends

---

[1]*See* Tex. R. App. P. 47.4.

that the trial court reversibly erred by including a provocation instruction along with his requested necessity instruction in the jury charge. We affirm.

## I.    BACKGROUND FACTS

### A.    The Two Arrests

On two separate occasions less than a month apart, Appellant, a felon, was arrested for unlawfully carrying a firearm.

Fort Worth Police Officer Robert Costa, who was in the gang unit, testified that he already knew Appellant before the evening of the first arrest, May 31, 2015. Officer Costa stated that Appellant was in the Centros Most Wanted (CMW) gang, an offshoot of the Barrio Centro gang. Officer Costa explained that on that evening, he had observed Appellant walking around in his front yard for about twenty minutes. Officer Costa stated that Appellant was not carrying a gun then and did not seem scared or frightened. When Appellant and a passenger drove away from his home, Officer Costa and his partner, Officer Jonathan McKee, followed him. At approximately 11:55 p.m., they stopped Appellant for turning right at an intersection without using a turn signal. Instead of stopping after Officer Costa turned on his overhead lights, Appellant drove back to his home, less than a block away, and then stopped. Officer Costa approached Appellant's vehicle and smelled marihuana. He asked Appellant to exit the vehicle, and Officer McKee asked Appellant's passenger to also exit the car. As Appellant disembarked, he winced in pain. When Officer Costa asked Appellant what was wrong, Appellant stated that he had recently shot himself in the right

2

leg. Officer Costa then noticed Officer McKee exit Appellant's vehicle with a handgun. Appellant confirmed to Officer Costa that that was the weapon with which he had shot his leg. After Officer Costa confirmed that Appellant had prior felony convictions, he arrested Appellant for unlawful possession of a firearm by a felon.

Officer Costa testified that when he first spoke with Appellant after stopping him that night, Appellant did not indicate that he was in danger. Instead, before the arrest, rather than expressing concern for his safety, Appellant's "main concern was he thought [the police] were after the wrong person." Officer Costa testified that Appellant, seeming "extremely paranoid" and delusional and appearing to be on methamphetamine, told him that he "knew who [Costa was] looking for." Officer Costa testified that he had not been looking for anyone.

Fort Worth Police Officer Danielle McConahay testified that on June 26, 2015, a sunny day, she was working patrol in the central division. She was driving westbound on East Berry Street, headed to a call, when a UPS driver pulled over in front of her. "[H]e got out of his car, and he kind of ran over with his hands up, look[ing] concerned." The UPS driver told Officer McConahay that "a man wearing camo [was] walking eastbound on . . . East Berry over the 35 bridge and that he was carrying a gun." Officer McConahay continued to drive "westbound to look for the guy." When she spoke with dispatch, she learned that other people had called about the man as early as the previous night

3

and that he was not brandishing the weapon. When Officer McConahay spotted the man, he was calmly walking through a parking lot, carrying a shotgun on his shoulder. He was not threatening anyone, so Officer McConahay approached the man just "to talk to him to see what[ was] going on, see what he[ was] doing, see what he[ was] thinking." In the conversation, the man, whom Officer McConahay identified as Appellant at trial, told the officer that "[h]e was a convicted felon, and he had a gun and . . . to do what [she] needed to do." After verifying that Appellant was a felon, Officer McConahay arrested him.

In each instance, Appellant claimed that he needed the gun for protection.

## B. The Jury Charge

The trial court granted Appellant's requested instruction on the defense of necessity but also granted the State's related provocation instruction over Appellant's objection. At the charge conference, the State objected to the necessity defense instruction's inclusion in the charge because "there [was] no evidence at all in this trial concerning" imminence. The trial court overruled that objection but then granted the State's requested provocation instruction. Defense counsel objected. The charge reads,

> As to the law of necessity, you are instructed that a person's conduct is justified if that person reasonably believes his conduct is immediately necessary to avoid imminent harm; and the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

4

A defendant who provokes the difficulty or is responsible for placing himself in a position from which he attempts to extricate himself by a criminal act is not entitled to the defense of necessity.

Now, if you find and believe from the evidence that on the occasion in question the defendant reasonably believed, viewed from the standpoint of the defendant at the time, that his conduct of unlawful possessing a weapon was immediately necessary to avoid imminent harm, and the desirability and urgency of avoiding the harm clearly outweighed, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct, then you should acquit the defendant, or, if you have a reasonable doubt as to whether or not the defendant acted reasonably or the desirability and urgency of avoiding the harm was unreasonable under the circumstances, then you should give the defendant the benefit of that doubt and say by your verdict "not guilty."

## II.     DISCUSSION

## A.     The Necessity Defense

### 1.     General Parameters of the Necessity Defense

Our court recently discussed the necessity defense:

Necessity is a justification defense that excuses a defendant's otherwise unlawful conduct if (1) the defendant reasonably believed the conduct was immediately necessary to avoid imminent harm, (2) the desirability and urgency of avoiding the harm clearly outweighed, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct, and (3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear. *See* Tex. Penal Code Ann. §§ 9.02, 9.22 (West 2011); *Young v. State*, 991 S.W.2d 835, 838 (Tex. Crim. App.[), *cert. denied*, 528 U.S. 1063 (1999)]. It is a confession-and-avoidance defense, meaning a defendant is not entitled to a necessity instruction unless he admits to the conduct—the act and the culpable mental state—of the charged offense and then offers necessity as a justification.[2]   *See Juarez v. State*,

---

[2]An instruction on a confession-and-avoidance defense like necessity is proper "only when 'the defendant's defensive evidence essentially admits to

5

308 S.W.3d 398, 399 (Tex. Crim. App. 2010); *Pennington v. State*, 54 S.W.3d 852, 856 (Tex. App.—Fort Worth 2001, pet. ref'd).

---

every element of the offense, including the culpable mental state, but interposes the justification to excuse the otherwise criminal conduct.'" *Cornet v. State*, 417 S.W.3d 446, 451 (Tex. Crim. App. 2013) (quoting *Shaw v. State*, 243 S.W.3d 647, 659 (Tex. Crim. App. 2007), *cert. denied*, 553 U.S. 1059 (2008)). "As for 'admitting' conduct under the doctrine of confession and avoidance, it is sufficient that the defendant point to defensive evidence, originating in his own statements, such that a trier of fact could reasonably infer that each element of the offense has been satisfied." *Cornet v. State*, 359 S.W.3d 217, 226 (Tex. Crim. App. 2012).

While neither party mentions this issue, our review of the record reveals that Appellant did not testify or call any witnesses, and the exhibits he offered into evidence had nothing to do with his commission of the offenses. On the other hand, the defense discussed necessity in its voir dire and opening statement, developed its theory of necessity through cross-examination of the State's witnesses, and continued in that vein in the closing statement, with Appellant's trial counsel explicitly stating,

> I'm primarily going to talk to you right now about the law of necessity, because in my mind in both of these cases in the Charge, that's the key. That's the key to this case. Okay. There's no question about the fact that [Appellant]'s a felon. No . . . question about the fact that he had a gun on two different occasions.

Further, Appellant stipulated to his arrests for the two offenses (but not his guilt) and his prior felony conviction and also stipulated that these facts are "evidence in the case."

We do not need to decide whether Appellant's focus on necessity in the nonevidentiary parts of the trial and his signed stipulation attesting to his arrests in these cases as well as his prior felony conviction sufficiently satisfy his burden to admit the charged offenses despite the absence of relevant defensive evidence because we hold that error, if any, in giving the provocation instruction was harmless.

6

*Spence v. State*, No. 02-16-00222-CR, 2017 WL 3526346, at *3 (Tex. App.—Fort Worth Aug. 17, 2017, pet. ref'd) (mem. op., not designated for publication) (selected citations omitted).

### 2. The Disputed Provocation Exception

#### a. Appellant's Sole Point

In his sole point, Appellant contends that the trial court erred by including the provocation instruction over his objection. Some courts, including this one, have held that a defendant who provokes the difficulty which he in turn commits a crime to resolve or who is responsible for placing himself in a position that he then tries to get out of by committing a crime is not entitled to a necessity defense. *See, e.g.*, *id.* at *3–4; *Shafer v. State*, 919 S.W.2d 885, 887 (Tex. App.—Fort Worth 1996, pet. ref'd). Appellant challenges this "provocation exception." He contends that the sole, ultimate basis of the holdings of this court and others recognizing this exception is unsupported dicta in *Leach v. State*, 726 S.W.2d 598, 600 (Tex. App.—Houston [14th Dist.] 1987, no pet.). *See, e.g.*, *Timmons v. State*, No. 13-15-00505-CR, 2017 WL 1549226, at *4 n.2 (Tex. App.—Corpus Christi Apr. 27, 2017, no pet.) (mem. op., not designated for publication); *Ford v. State*, 112 S.W.3d 788, 794 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *Rangel v. State*, Nos. 04-01-00451-CR, 04-01-00452-CR, 04–01–00453–CR, 2002 WL 1625576, at *3–4 (Tex. App.—San Antonio July 24, 2002, no pet.) (not designated for publication); *Singleton v. State*, No. 03-01-00057-CR, 2002 WL 389263, at *6 (Tex. App.—Austin Mar. 14, 2002, pet. ref'd)

7

(not designated for publication); *Miller v. State*, 940 S.W.2d 810, 815 (Tex. App.—Fort Worth 1997, pet. ref'd); *Shafer*, 919 S.W.2d at 887; *McFarland v. State*, 784 S.W.2d 52, 54 (Tex. App.—Houston [1st Dist.] 1990, no pet.); *Goodin v. State*, 750 S.W.2d 857, 862 (Tex. App.—Corpus Christi 1988, pet. ref'd). Appellant contends that because the provocation exception is based on neither caselaw from the Texas Court of Criminal Appeals nor statutory law, it is neither an exception to the necessity defense nor part of the law applicable to the case. He therefore contends that the trial court erred by including the provocation instruction in the jury charge. Alternatively, Appellant contends that "the facts, law, and equity itself require a finding that" he did not provoke the difficulty.

### b. Split of Authority

Our sister court in Waco, which supports Appellant's position, *see Ray v. State*, 419 S.W.3d 467, 468–69 (Tex. App.—Waco 2013, pet. ref'd), relies on language from the Texas Court of Criminal Appeals noting that "(t)he plain language codifying the necessity defense evinces a legislative intent that the defense apply to all offenses unless the legislature has specifically excluded it from them." *Bowen v. State*, 162 S.W.3d 226, 228–29 (Tex. Crim. App. 2005) (quoting *Spakes v. State*, 913 S.W.2d 597, 598 (Tex. Crim. App. 1996)); *see also* Tex. Penal Code Ann. § 9.22; *Vasquez v. State*, 830 S.W.2d 948, 950 (Tex. Crim. App. 1992). Because the legislature has not included a provocation exception in the necessity statute, the Waco court likewise did not apply the exception in *Ray*. 419 S.W.3d at 468–69.

8

### c. We Do Not Need to Resolve the Split of Authority or Determine Error Because There Is No Harm.

We do not need to decide whether to follow or overrule our precedent regarding the propriety of including a provocation instruction with an instruction on necessity because, as we hold below, even if the trial court erred by including a provocation instruction along with the necessity instruction, error, if any, was harmless. *See* Tex. R. App. 47.1; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). As addressed more fully below, the evidence supported the jury's rejection of the necessity defense regardless of the provocation instruction because the evidence did not show that Appellant's possession of a firearm was "immediately necessary to avoid imminent harm" in either case. *See* Tex. Penal Code Ann. § 9.22(1); *Dobry v. State*, Nos. 02-14-00508-CR, 02-14-00509-CR, 2016 WL 1469988, at *3 (Tex. App.—Fort Worth Apr. 14, 2016, no pet.) (mem. op., not designated for publication).

## B. *Almanza* Harm Analysis

### 1. Standard of Review

Error in the charge, if timely objected to in the trial court, requires reversal if the error was "calculated to injure the rights of [the] defendant," which means no more than that there must be *some* harm to the accused from the error. Tex. Code Crim. Proc. Ann. art. 36.19 (West 2006); *Abdnor v. State*, 871 S.W.2d 726, 732 (Tex. Crim. App. 1994); *Almanza*, 686 S.W.2d at 171; *see also Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). In other words, a properly

preserved error will require reversal if it is not harmless. *Almanza*, 686 S.W.2d at 171. This analysis requires a reviewing court to consider (1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the record. *Reeves*, 420 S.W.3d at 816; *see also Almanza*, 686 S.W.2d at 171 ("[T]he actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole.").

## 2. Analysis

### a. The State of the Evidence

Even absent the provocation instruction, the evidence sufficiently supports the jury's rejection of the necessity defense in both cases because Appellant's conduct was not immediately necessary to avoid imminent harm.

#### i. Standard for Reviewing Sufficiency of the Evidence

A defendant has the burden of producing some evidence to support a claim of necessity. *See Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). The State thereafter has the burden of persuasion in disproving the defense. *See Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991). This burden does not require the State to produce evidence refuting the necessity claim; rather, the burden requires the State to prove its case beyond a reasonable doubt. *See id.* at 913. A jury verdict of guilty is an implicit finding rejecting the defendant's necessity theory. *See id.* at 914.

10

In reviewing the sufficiency of the evidence to support the jury's rejection of Appellant's theory of necessity, we examine all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense of unlawful possession of a firearm by a felon and also could have found against him on the necessity issue beyond a reasonable doubt. *See id.* Because our goal here is to determine whether the jury would have convicted Appellant without the provocation instruction, we proceed as if that instruction were absent.

### ii.     The Immediacy Elements of Necessity

In explaining the immediacy requirements of self-defense and defense of a third person, the Texas Court of Criminal Appeals analogized to the same requirements of necessity:

> "Imminent" has been defined as "ready to take place, near at hand, impending, hanging threateningly over one's head, menacingly near." Thus, imminent harm is harm that is ready to take place— harm that is coming in the very near future. Logically, then, if conduct is "immediately necessary" to avoid harm that is imminent, that conduct is needed right now. The justification defense of necessity applies when action is needed "immediately" (i.e., now) to avoid "imminent" harm (i.e., harm that is near at hand).

*Henley v. State*, 493 S.W.3d 77, 89 (Tex. Crim. App. 2016) (citations omitted) (relying in part on *Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989)). Intermediate courts of appeal provide that imminent harm:

- "is impending, not pending," *Davis v. State*, 490 S.W.3d 268, 275 (Tex. App.—Fort Worth 2016, pet. ref'd);

11

- "is immediate" and "going to happen now," *Harper v. State*, 508 S.W.3d 461, 468 (Tex. App.—Fort Worth 2015, pet. ref'd) (citations omitted);

- "is on the point of happening, not about to happen," *Pennington*, 54 S.W.3d at 857;

- "contemplates a reaction to circumstances that must be the result of a split-second decision (made) without time to consider the law," *Dewalt v. State*, 307 S.W.3d 437, 454 (Tex. App.—Austin 2010, pet. ref'd) (citations omitted);

- "occurs when there is an emergency situation, and it is immediately necessary to avoid that harm when a split-second decision is required without time to consider the law," *Smith v. State*, 874 S.W.2d 269, 273 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd); and

- is "an immediate, non-deliberative action made without hesitation or thought of the legal consequence," *Stefanoff v. State*, 78 S.W.3d 496, 501 (Tex. App.—Austin 2002, pet. ref'd) (op. on reh'g).

### iii. The May 31, 2015 Offense

### (a) The Evidence

### (1) Officer Costa's Testimony

Officer Robert Costa testified that after he arrested Appellant on May 31, 2015, Appellant told him about a recent burglary:

> Well, what he had told me was some of his old [CMW] running buddies had been casing gun shows. And what they would do is go into the gun shows and follow these people back home. Not necessarily purchase weapons at the gun show, but follow the people back home and then wait for them to leave and burglarize their residence.

Appellant told Officer Costa the names of the three people who had been involved in that burglary, one of whom Officer Costa knew was in Appellant's gang, one who was either in that gang or one friendly to it, and one whose gang status Officer Costa did not know.

12

Officer Costa testified that Appellant "stated that he was paranoid. He thought that [the burglar who was also his fellow gang member] may have been coming by looking for him, and he thought that the house that they hit may have been a Cartel house." But Appellant did not identify the specific Cartel, nor did he provide a specific reason that the Cartel would want to kill him. Officer Costa also stated that he did not see any gang members or Cartel members drive by the scene of the arrest. Officer Costa answered affirmatively that in his opinion, Appellant's offer to provide information was his attempt to leverage his way out of the charge for unlawfully possessing the handgun.

On cross-examination, Officer Costa denied believing that Appellant thought he was in imminent danger when he talked about the Cartel and gang members wanting to kill him. Officer Costa testified that based on what he observed when he watched Appellant walking around his yard before the traffic stop, Appellant did not seem scared of any imminent violence: "I don't believe he feared for his life. His actions seemed fairly normal. [He was g]oing in and out of the back of the vehicle[ and i]n and out of the house. [He was j]ust walking freely in the front yard. Nothing out of the normal." Officer Costa admitted on cross-examination that the handgun was in Appellant's car, near where Appellant walked in his yard, "right there where he c[ould] get to it" if he needed it.

Officer Costa further admitted:

- Appellant could have been paranoid because of fear related to gang activity;

13

- Appellant told him that he believed "someone was after him";

- Appellant had "expressed fear" of both gang and Cartel members "that might have been after him and maybe even take his life";

- Cartels "traffic [in] narcotics" and "kill people over drugs and money"; and

- Informants' lives can be at risk.

The following exchange also took place on the cross-examination of Officer Costa:

> Q.    . . . . If you got a gang member or a former gang member that's expressing to you that he fear[s] for his life, do you think it would be reasonable for that person to arm him or herself?
>
> A.    If he felt he needed to protect himself.
>
> . . . .
>
> Q.    And it wouldn't be unreasonable to arm yourself if you were in fear for your life, correct?
>
> A.    It would be reasonable if you were a law-abiding citizen. Once you become a felon, you've given up that right.
>
> Finally, Officer Costa emphasized that "at the point [Appellant] was fearing

for his life, he wasn't a snitch yet."

### (2)    Officer McKee's Testimony

Officer Jonathan McKee testified that he and Officer Costa waited a "[c]ouple of minutes, if that" and "two minutes or less" at Appellant's house before he drove off and they followed him. Officer McKee also testified that only Officer Costa "had eyes on" the house. From their vantage point, Officer McKee could not see the house and did not see Appellant walking around.

14

Appellant told Officer McKee that someone who owed him money had given him the handgun.

Officer McKee testified that after the arrest, Appellant "told [the officers] that he believed that people were after him, out to hurt him," and Appellant identified those "people" as gang members who had committed a burglary.

Officer McKee denied:

- that Appellant acted like he was scared;

- that Appellant acted paranoid; and

- that Appellant told him specifically whether he was being targeted or being threatened.

But Officer McKee testified that Appellant had "said that someone had put a green light bulb on his porch or patio light, and that he had seen a suspicious vehicle drive by several times." Officer McKee explained that Appellant believed that he had been "greenlit" or "green-lighted," which meant that a gang had "given their approval for [him] to be killed."

### (3)    Detective Paul Ufkes's Testimony

Detective Paul Ufkes of the Fort Worth Police Department testified that:

- He was the on-call detective at the time of Appellant's arrest;

- Gang enforcement officers called him in the middle of the night to tell him they had arrested Appellant for unlawful possession of a firearm by a felon, and he had some information about a burglary;

- Detective Ufkes went in to the police department to interview Appellant;

- Appellant "seemed very agitated" when Detective Ufkes arrived;

15

- Appellant "seemed to be concerned for some children. That was what he was agitated about";

- Appellant "was very concerned for his kids when [Officer Ufkes] first arrived";

- Appellant told the detective that three of his associates had "broke[n] into a house . . . on the west side on Harley Street" and had taken a safe containing $240,000;

- Appellant identified a photo of a fellow gang member who was one of the burglars;

- Detective Ufkes confirmed that the house had been burglarized on May 2, 2015, but the report had not indicated the amount of money stolen;

- The wife of one of the identified burglars bought a new pickup for $25,000 cash a few days after the May 2, 2015 burglary, which made Appellant's story about the burglary more credible;

- Appellant gave Detective Ufkes the information because he thought "that he would be blamed for the burglary[] and . . . the house that was broken into had possible Cartel ties," based on the fact that more than $200,000 was taken in the burglary and Appellant's belief that "there was no way . . . Mexicans [could] make that much money without being Cartel";

- Appellant was in the hospital for infected self-inflicted gunshot wounds when the burglary occurred;

- Appellant had shot himself with the handgun, which he had received from one of the burglars in partial payment of a debt before the burglary;

- Appellant indicated in the interview that he was present when "they broke open the safe" that had been taken in the burglary and that he had helped count the money;

- Appellant said the burglars were supposed to buy him a vehicle but "they never gave him shit"; they did buy him some marihuana;

- Detective Ufkes spoke to one of the complainants in the burglary, Sandra Saldana;

- The Saldanas later told the lead detective on the burglary case that more than $200,000 had been in the stolen safe;

- Cartel drug operations deal in large amounts of cash and do not want to report it;

- The burglars could have reasonably deduced that the house they had targeted was a Cartel house based on the amount of money in the safe;

- A couple of days after his arrest, Appellant met with Detective Ufkes and pointed out the burgled house, which was the Saldana house, but he also seemed to be under the influence of drugs: "He was very erratic, kind of bouncing";

- People with long-term drug problems can become very paranoid;

- Appellant was concerned that someone would hurt his family;

- During the interview, Appellant led Detective Ufkes to believe that he was afraid of both his gang and the Cartel;

- Detective Ufkes was not made aware that night of any shootings or 911 calls regarding Appellant's family members;

- Detective Ufkes had not learned during the ensuing investigation that any of Appellant's family members had been "shot or hurt";

- Neither Detective Ufkes nor "anyone else" advised Appellant to carry a gun to protect himself against the Cartel;

- Appellant may have put himself at risk by snitching on the burglars, but he also might have been trying to "lessen his offense" by doing so;

- Gang members and the Cartel are both capable of sudden violence and of causing imminent death and "are willing to use that sort of violence against people who snitch on them"; and

- Detective Ufkes had no report or record of violence or attempted violence against Appellant or his family by a Cartel or anyone else.

Detective Ufkes testified that Appellant did not:

- tell the detective that he had personal knowledge that someone at the Saldana house was in the Cartel;

- tell the detective that he had spoken to anyone at the house or in his gang who had told him the house was a Cartel house;

17

- name specific instances when the Cartel had shot at his house and missed;

- tell Detective Ufkes that he was trying to get out of the gang;

- give Detective Ufkes a reason to believe that he was forced to join a gang;

- tell Detective Ufkes that one of the burglars was at his house on May 31, 2015 trying to shoot him;

- tell Detective Ufkes that the complainants in the Saldana burglary were at his house on May 31, 2015 threatening to kill him;

- tell the detective that when gang enforcement officers arrived at Appellant's house, gunmen with guns trained on his house were also present;

- have any letters, recordings, or physical evidence to support his Cartel claim;

- have the green light bulb he claimed had been put in the light fixture at his house; or

- help Detective Ufkes with the burglary investigation after bonding out of jail.

### (4)  Sandra Saldana's Testimony

Sandra Saldana testified that:

- She lived on Harley Street in Fort Worth with her two younger brothers, her two minor children, and her parents;

- She worked and attended nursing school;

- Her mother cleaned three or four houses per week and usually made $60 per house;

- Her father had a lawn care service company;

- One brother worked in the administrative department of a local college;

- One brother worked for a gym;

- The family's home was burglarized on Saturday, May 2, 2015;

18

- The items stolen included lawn equipment, electronics, shoes, clothes, jewelry, and a safe;

- The safe held car titles, house titles, credit cards, checks, and around $200,000 in cash;

- The cash in the safe belonged to all five of the adults in the house and was not separated by owner;

- Her father had recently taken money out of the bank and put it in the safe because he "was about to buy a house" as an investment and had a meeting with a realtor scheduled for the following Monday morning;

- She told the detective in charge of the burglary how much money was taken in her first meeting with him a week after the burglary;

- The family had not recovered any of the stolen property;

- Appellant, whom the family did not know, began leaving messages at the home phone number and texting Saldana's father;

- Appellant told Saldana that he obtained the telephone numbers from paperwork that was in the safe; and

- About seven weeks after the burglary, Appellant met with the five Saldana adults in his front yard.

Saldana further testified:

> [Appellant] basically gave [the Saldana family] a lot of details as far as information—well, as far as what was in the safe, things that he had seen, people that broke in. . . . [H]e told [the Saldanas] who did what, who was where. He gave [the Saldana family] names. . . . [H]e showed [the Saldanas] pictures. He gave [the Saldanas] . . . relatives to those people that supposedly broke into [the Saldana] house.

Saldana stated that Appellant told her family that his friends were "trying to blame him for the burglary" and also that "his friends told him [that the Saldanas] were paying them to blame him for the burglary," and he wanted to clear his name. Saldana testified that Appellant gave her a cellular phone he took from

one of the burglars and encouraged her to take it to the police. Appellant told the family that they knew where to find him if they or the police needed anything else. When the family took the phone to the detective in the burglary case, he looked at its contents and warned them not to "mess with those . . . people [the persons portrayed in the photographs in Defense Exhibits One and Two, who Appellant told Saldana were the burglars] because [they] owe money to other people in north side who are related to the Cartels." The detective returned the phone to the family.

About a week after Appellant gave the family the phone, he began calling and texting to ask for it back. Eventually, he showed up at the Saldanas' home, saying that he needed the phone back and complaining that the Saldanas were not offering him money for information. He implied that the Saldanas were in the Cartel. In her testimony, Saldana denied that:

- Anyone in her family was connected to a Cartel;

- The cash in the safe was drug money;

- She knew any Cartel members; and

- The family had been investigated by the police as being a Cartel drug family.

### (b) The Evidence Supports the Rejection of the Necessity Defense Because There is No Evidence of Imminence.

Even ignoring the provocation instruction, a jury could have found against Appellant on the necessity issue beyond a reasonable doubt regarding the May 2015 offense because there was no evidence of imminence. The burglary had

20

occurred almost a month before the arrest.  Appellant had possessed the handgun even before the burglary.  Officer Costa observed him walking around, unarmed, in his own yard for about twenty minutes before the arrest.  There was no evidence that his fellow gang members, the Cartel, or anyone else threatening his life or the lives of third persons was near his home—the place of his arrest—at the time of his arrest.  While there was some evidence that Appellant was generally afraid, no evidence indicated that when he got in his car and drove away from his house that evening, an emergency justified his possessing the handgun.  See *Dewalt*, 307 S.W.3d at 454–56.

### iv.    The June 26, 2015 Arrest

### (a)    The Evidence

In the daylight hours of June 26, 2015, Appellant was spotted calmly carrying a shotgun on his shoulder on Berry Street over the Interstate 35 bridge.  The police had also received calls the previous night about him walking around with the shotgun.  Appellant never pointed the weapon at anyone and never behaved in a threatening manner.  When Officer McConahay reached him, he was walking across a parking lot.  Officer McConahay testified that Appellant told her:

- "[H]e had upset the Cartel or maybe his family.  Somebody had upset the Cartel and somehow he was involved with that, and . . . he had the gun for protection" because "the Cartel was after him"; and

- "[H]e wasn't going to shoot anyone unless they pointed a gun at him."

21

On redirect examination, Officer McConahay explained that "unless" indicated a "possible future danger," not an ongoing danger. Officer McConahay denied that Appellant seemed scared: "[H]e wasn't running. He didn't seem overly frightened. He wasn't crying. He was just kind of telling me what was happening." She testified that Appellant did not identify anyone as a threat to him when she first made contact.

Appellant told Officer McConahay that he lived on Butler, which she testified was within her patrol area, but was "pretty far" and "a pretty good walk" from where she arrested him.

In State's Exhibit 19, the audio-video recording from Officer McConahay's body camera, Appellant told her that (1) he was wearing his brother's camouflage clothing because the Cartel put out a green light on him for snitching on them and (2) he also "ratted" on his friends. Appellant admitted to Officer McConahay that he was not told to get a gun but stated that he was told to do whatever he needed to do to stay safe. He also told her that he wanted to report more information to the CIA or Homeland Security. He did not specifically discuss his providing information to the Fort Worth Police Department about the Saldana burglary.

### (b) The Evidence Supports the Rejection of the Necessity Defense Because There is No Evidence of Imminence.

In determining Appellant's guilt for the June 2015 offense, a jury could have found against him on the necessity issue beyond a reasonable doubt

22

because again, there was no evidence of imminence. Appellant had been seen walking around with the shotgun during the night before his arrest as well as when he was arrested in broad daylight. No one had seen him point the gun at anyone or behave in a threatening manner. While he expressed a general fear of the Cartel and his friends and a general need to defend himself, there was no evidence that anyone was literally and specifically threatening his life or the lives of third persons in the moments at or near the time of his arrest. That is, there was no evidence that Appellant needed to carry that shotgun on June 26, 2015 while walking on or near Berry Street to prevent someone nearby from injuring or killing him immediately. *See Dewalt*, 307 S.W.3d at 454–56.

### b. The Rest of the Jury Charge, Voir Dire, and Opening Statement

The remainder of the jury charge here does not affect harm. Further, the State did not touch on provocation in its voir dire or opening statement.

### c. Closing Argument

While Appellant argues that "the State used the objectionable charge language [in its initial closing argument] to legitimate threats to Appellant's life and family represented by opposing gangs and cartel members," the State did not refer to the provocation exception explicitly. Instead, the State stated,

> What the defendant is asking you for is permission, permission for him to carry a gun. A convicted felon who is a gang member wants a standing license to carry a firearm.
>
> When you enter the gang lifestyle, when you decide to be a gang member, you have chosen a life where violence is

23

commonplace. Gangs have rival gangs. When you join a gang, you instantly have people who want to hurt you. You instantly have enemies. So this would just apply across the board to gang members. It would allow them to carry guns any time they want, anywhere they want and of any type they want.

The State focused its initial closing argument on the absence of imminent harm, not on provocation.

After the defense discussed the absence of provocation on several occasions in its closing argument, the State briefly discussed provocation in a couple of paragraphs of its more than six pages of final closing argument:

> Finally, you can't get the necessity defense if you provoke the issue. Now, it's met a bunch of different ways this is going on. First of all, for a long time [Appellant] has been involved in the gang lifestyle, and there's no evidence from any source that's quit. And he made friends with these guys. He hangs out with these guys. He was there counting the money that they stole, that he says is Cartel money. He was counting it. He wanted to get a cut of it. And then he wants to be scared of them.

> He's the one that decided to turn in his friends. He's the one that decided to tell all that was going on, and yet he's now afraid for that reason so he can carry a gun. He says that the Cartel is after him, and he told you—he said who they were. They were the victims of that burglary, and yet he approaches them. He extorts them, and then he wants to say he can carry a gun for that reason. That is not what this defense is made for. Just like [the other prosecutor] said, that is just giving someone a license to carry a gun because they make up some reason to do it.

Then the State returned to its main theme—that there was no necessity because there was no imminent harm requiring an immediate act:

> There is no necessity here. This isn't someone accosted him at a Wal-Mart, and he grabbed a weapon off the shelf. This is not someone burglarized his house, and he took the weapon from them and turned it on them. It's not he went next door and got a gun from

24

someone that was actively shooting at his house to return fire. There's none of that.

### d. Any Error Was Harmless.

There was no evidence that Appellant needed a weapon on either occasion to combat an act of split-second violence. If he had been under attack when he grabbed a weapon and was then charged with unlawful possession of a firearm by a felon, our analysis would likely be different. But under the facts surrounding Appellant's two arrests here, because there was no necessity, error, if any, in tying Appellant's entitlement to the necessity defense to the absence of provocation was harmless. We overrule Appellant's sole point.

### III. CONCLUSION

Having overruled Appellant's sole point, we affirm the trial court's judgments.

/s/ Mark T. Pittman
MARK T. PITTMAN
JUSTICE

PANEL: MEIER, GABRIEL, and PITTMAN, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: February 1, 2018

25