

# NUMBER 13-19-00207-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

JACE MONTANGE,                                                              Appellant,

v.

THE STATE OF TEXAS,                                                          Appellee.

### On appeal from the 117th District Court of Nueces County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Perkes Memorandum Opinion by Justice Longoria**

Appellant Jace Montange was convicted of murder and engaging in organized criminal activity, both first-degree felonies. *See* TEX. PENAL CODE ANN. §§ 19.02, 71.02. The jury sentenced appellant to concurrent prison terms of forty-six years and twenty-five years. Appellant argues the evidence is factually and legally insufficient to sustain the

jury's verdict of guilty and its rejection of the affirmative defense of duress. We affirm.

## I. BACKGROUND

Count I of the indictment alleged that appellant "commit[ed] an act clearly dangerous to human life that caused the death of the complainant by shooting a firearm at Juan Montez" on or about October 21, 2017. *See id*. § 19.02. Count II alleged that appellant, on or about October 21, 2017, "with the intent to establish, maintain, or participate in a combination or in the profits of a combination, the combination consisting of [appellant] and Cedric Green, Chloe Huehlefeld, and Randy Dorsey, who collaborated in carrying on criminal activity, intentionally and knowingly commit[ted] the offense of Murder and/or Aggravated Assault."[1] *See id*. § 71.02.

At trial, Deputy Jason Vead of the Nueces County Sheriff's Office testified that on October 21, 2017, he and his field training officer Corporal Valeria Garza received a call for "an unknown EMS." When they arrived at the location, Deputy Vead indicated that he saw a person, later identified as Elizabeth Stephanie Montez, a transgender woman, "sitting kind of slumped over against the house" who said, "help me" and "they're trying to kill me," before losing consciousness. Corporal Garza secured the area around the house. Deputy Vead attempted to keep Montez awake, but Montez lost a pulse and Deputy Vead began CPR. Deputy Vead explained that Lieutenant Roland Martinez[2] also arrived at the scene and began to assist in CPR. The owner of the home where Montez was found told

---

[1] Chloe Huehlefeld and Cedric Green were also tried and convicted of murder and engaging in organized criminal activity. *See Huehlefeld v. State*, No. 13-18-00688-CR, 2019 WL 3331636 (Tex. App.—Corpus Christi–Edinburg July 25, 2019, no pet.) (mem. op., not designated for publication); *Green v. State*, No. 13-18-00690-CR, 2020 WL _____ (Tex. App.—Corpus Christi–Edinburg Nov. __, 2020, no pet. h.) (mem. op., not designated for publication) (available at http://search.txcourts.gov/Case.aspx?cn=13-18-00690-CR&coa=coa13).

[2] At the time of the incident, Roland Martinez was a Sergeant with the Nueces County Sheriff's Office, but he was promoted to Lieutenant by the time of trial.

Deputy Vead that prior to Montez being on her doorstep, she heard "three to four pops" outside of her house and saw Montez crawling through the brush to her front porch. Deputy Vead testified that once the ambulance arrived and took Montez for treatment, the criminal investigation division arrived on the scene and took over the investigation.

Lieutenant Martinez testified that when he arrived on the scene, he initially did a check to secure the area to "make sure there [were] no outlying threats." He then tended to Montez who he observed had gunshot wounds. Lieutenant Martinez assisted in administering CPR until the medics arrived—he opted to continue assisting the medics in CPR in the ambulance en route to the hospital. Once at the hospital, Montez was tended to by the trauma team, but ultimately succumbed to her injuries.

Ray Fernandez, M.D., the medical examiner for Nueces County, performed the autopsy and testified that Montez was shot five times, two of which were fatal. Montez also had cocaine and valium in her system, but neither were lethal amounts. Dr. Fernandez further testified that Montez had abrasions and scratches on her legs which were consistent with Montez running through a wooded brush area. Dr. Fernandez stated that the gunshot wounds and angles of penetration indicated that Montez was shot at a distance of more than two-and-a-half feet away.

Allyson Jongema testified that she was a prostitute and a drug user. She bought drugs from Green and considered him a friend. According to Jongema, Green had violent tendencies and had previously been physically and emotionally abusive to her. Jongema testified that, on the date of Montez's murder, Green and appellant showed up at a house where she was. Green and appellant were arguing with the man who lived there and were looking for stolen money. Jongema testified that she tried to gather her things and leave,

3

but that Green "snapped his fingers and told [appellant] not to let [her] leave." Appellant then stood in the doorway, preventing Jongema from leaving. Green and appellant left after Green finished his conversation with the resident and Jongema left shortly after. Jongema knew appellant and Green to be friends.

Jongema knew Montez socially and they would "drink and smoke crack together." The day of the murder, Jongema saw Montez in the afternoon crying and looking "distraught." In the early morning hours after the murder, Jongema testified that she saw Green standing in the parking lot of her apartment complex with an "AR" style gun. She knew that Green was "supposedly" affiliated with a gang but testified that she didn't know for sure.

On cross-examination, Jongema explained that she had previously testified in the case against Huehlefeld regarding the same murder. During her testimony in Huehlefeld's case, she did not discuss how appellant blocked the doorway, refusing to let her pass, as Green argued with another man; she did, however, testify regarding the doorway incident in Green's case as well as in her statement to investigators.

The property manager for Weber Manor Apartments, Norris Stricker, testified that Montez was a resident at the apartments and that he provided police with videos from surveillance cameras that were located on the property. One of the videos showed Huehlefeld and a male going to Montez's apartment around lunchtime on the day of the murder and leaving shortly after with a bag.

A manager from Church's Chicken, which neighbors the Weber Manor Apartments, also testified regarding surveillance video footage. On the date of the murder, Montez went into the Church's Chicken to exchange a roll of dimes for cash. A

4

few hours later, Green came into the store and asked about someone exchanging a roll of dimes; shortly after, appellant came in and also inquired about the dimes. Appellant and Green both appeared upset and were traveling together.

Detective Bryan Hardin of the Nueces County Sheriff's Office testified that he was called in to the crime scene where Montez was found. As part of his investigation, he looked for evidence, took photographs, and "collected some sandals." The sandals were located near some blood stains in the grass "50 or 60 feet" from the house where Montez was located. Detective Hardin and additional officers processed the scene the next day, taking additional photographs and collecting additional evidence. After processing the crime scene, Detective Hardin assisted in the interview of Montez's sister and processed Montez's apartment. In walking around looking for surveillance cameras near the apartment, Detective Hardin stopped into the nearby Church's Chicken and inquired about their cameras and Montez. The employee informed Detective Hardin that Montez was a frequent customer and told him about the recent dime exchange by Montez and the men who came in later. Detective Hardin retrieved the surveillance footage from the Church's Chicken as well as additional surveillance videos from other nearby stores. Detective Hardin testified that Green and appellant went into those stores on the date of Montez's death and appeared to ask the store clerks a question and leave. Approximately three weeks later, warrants were obtained and executed for Green and Huehlefeld. At Green's apartment, police located a "large number of cell phones," drugs, body armor, cash, and a Bushmaster AR-15 rifle. Detective Hardin testified that the items found are commonly used in the drug trade. The result of his investigation led to the arrest of appellant for the murder of Montez.

5

Captain Conrad Guzman[3] of the Nueces County Sherriff's Office testified that on October 21, 2017, he was called to the scene of a shooting. When he arrived, the victim was already transported to the hospital. Captain Guzman's main duty was to supervise the investigation, and while he assisted in interviews, he assigned Sergeant Dana Richardson as lead investigator. Captain Guzman was involved in the interviews of appellant, Green, and Huehlefeld.

Captain Guzman stated that appellant initially denied any involvement with the murder of Montez and instead suggested that Green was the murderer. As the interview progressed, appellant confessed to being at the scene of the murder, but not during the murder. Appellant also said he was "chief of security" in the street gang "Gangster Disciples," and that Green was a lower ranked member known as an "enforcer." Captain Guzman stated that at some point appellant stated that Green was trying to kill him, but that appellant continued to associate with Green after the murder of Montez.

Captain Roberto D. Garza Jr. of the Nueces County Sheriff's Office testified that he was one of the officers to interview appellant. Appellant told Captain Garza that he was involved in attempting to scare Montez into returning the money that she allegedly stole. During the interview, appellant initially said that when Green began firing shots at Montez, he ran back to the car. Appellant also told Captain Garza that he assisted Green in disposing of the weapon after the murder. Captain Garza said that appellant repeatedly mentioned that he wanted a "deal" for the information he was able to provide regarding the murder, which is not uncommon. Captain Garza testified that appellant said "[h]ey, what's going to happen to me. You know, I was scared. You know, I really think they were

---

[3] At the time of the incident, Conrad Guzman was a Lieutenant with the Nueces County Sheriff's Office, but he was promoted to Captain by the time of trial.

6

going to try to kill me." Captain Garza stated that he later came to learn that appellant made a subsequent statement in another interview with officers that he "fired all the shots at [Montez]."

Sergeant Marilyn King and Sergeant Tim Revis of the Nueces County Sheriff's Office testified that, in doing a walkthrough of the scene of the shooting, they were able to locate twelve spent shell casings from a 9-millimeter gun and "one projectile." Sergeant Revis testified regarding a walkthrough of the crime scene with appellant wherein appellant explained what happened at the crime scene and where the events of the murder took place.

Appellant's girlfriend, Danielle Perez, testified that at the time of Montez's murder, appellant was living with her. Perez said that appellant told her he "didn't want to do it" and "just cried" about shooting Montez. She recalled that appellant was a friend of Green's and that he was going to help Green get money back that had been stolen from Green. She further testified that appellant was "forced to do it" when discussing shooting the person who stole the money because appellant was "going to lose his life if he didn't take [Montez's]." When pressed on the issue, Perez admitted that she never stated that appellant was forced to do anything, nor that he was the shooter, when she gave a statement to investigators. She also admitted that appellant never told her he was "forced" to be at the scene of the murder. After the murder, appellant returned to Perez's apartment and Perez stated that appellant was "just kind of like in a shock" and started crying. Appellant told Perez that he was at the murder scene. The next day, they got into an argument and appellant left. While she denied it at first, when faced with her previous statements, Perez admitted she followed appellant when he left and that he went to

7

Green's apartment. Perez admitted she sat outside in her car for ten to twenty minutes before hearing what she believed to be gunshots and left. She said that appellant came home after that and said that Green tried to kill him.

Dorsey, who received a plea bargain of ten years' community supervision for his involvement in Montez's murder in exchange for his testimony, stated that the night before the shooting was the first time Dorsey met appellant at Green's house, where Dorsey had been staying. Green introduced Dorsey to appellant as a "family member of this organization" and clarified that he meant the "Black Gangster Disciples." He, Green, and appellant were all riding in the car together, and they had guns, but Dorsey stated they were for "showing off." Later that evening, Dorsey left for the night, but the next day he called Green to pick him up and stated that Green was not in a good mood because some of his money was missing. Dorsey said that Green first accused him of stealing the money and "pulled a gun" on him. After that, he went with Green and appellant to find Green's missing money. The three went to Montez's apartment where Green then accused Huehlefeld of taking his money, but she denied doing so. Green made Huehlefeld come with them and they all went back to Green's apartment. They began to do drugs at the apartment when Montez came by to purchase drugs. When Montez left, Huehlefeld realized she had left her purse at Montez's apartment and went to retrieve it. When she returned, Huehlefeld noticed that $20 in dimes that Green had given her were missing. Huehlefeld said that Montez was the only person who could have taken the money from her purse. Appellant and Dorsey then began to assist Green in looking for the money. They discovered that Montez exchanged rolled dimes for cash at the Church's Chicken.

After they determined that Montez took the $20, Green, Huehlefeld, and Dorsey discussed a plan to get revenge. Initially, they intended to have Huehlefeld fight Montez, but decided they needed to prove a point and that Montez needed to be killed for stealing the money. Part of the plan included using appellant as "bait" to pretend to be someone who sought Montez's prostitution services. According to Dorsey, the plan was to pick up Montez, and each person had an assigned spot in the car; Green driving, Huehlefeld in the passenger's seat, and Montez between appellant and Dorsey in the backseat. Sheets were placed in Green's vehicle "so no blood or no fingerprints, or nobody's DNA can get in the car."

They eventually brought Montez out to a field where Dorsey, Green, and appellant exited the vehicle first and went to the rear of the vehicle. There were two guns, an AR-15 and a "little silver gun." Dorsey testified that he removed the AR-15 from the vehicle, but Green ended up having both guns "on his person" at one point before Montez was shot. When Montez and Huehlefeld exited the vehicle, the three men were at the rear of the vehicle. At that point, according to Dorsey, the plan was for Huehlefeld to be the shooter.

Dorsey stated that appellant and Huehlefeld shot Montez. Huehlefeld shot at Montez first; the gun had one bullet in it. After she shot, Huehlefeld got scared and Green took the gun, reloaded it, and handed it to appellant. Green told appellant "to go finish the job." Dorsey said appellant then ran after Montez and shot her; Dorsey stated he heard "several" shots fired. After the shooting, Green, Huehlefeld, Dorsey, and appellant returned to the vehicle. Dorsey stated that Green "was cool in demeanor," but that Huehlefeld and appellant were scared and "shaking."

9

The four of them subsequently went to get rid of the gun, against Green's wishes. Green wanted to hide the gun and retrieve it later, but appellant convinced him otherwise. Appellant and Green dumped the gun while Dorsey and Huehlefeld waited in the car. Next, they returned to Green's apartment, changed into new clothing, and brought their clothes to a barbecue pit to burn them. After burning the clothes, Dorsey, Green, and Huehlefeld returned to Green's apartment and appellant went home. Dorsey believed that appellant was afraid of Green after the shooting and was looking to leave town.

On cross-examination, Dorsey explained that he suffers from seizures, paranoia, schizophrenia, and post-traumatic stress disorder (PTSD). On the day of the murder, in addition to using illegal drugs, Dorsey was taking medication for seizures, schizophrenia, and PTSD. Having known Green his "whole life," he testified that Green used people and was violent. Dorsey said that Green pulled a gun on him twice and that he had seen Green pull a gun on Huehlefeld and fire a gun at her in the past. Dorsey had been living with Green for approximately three months but had never met appellant until the day before the shooting. After the night of the shooting, he saw appellant "sometime after" and appellant was talking about how he wanted to get out of Texas, but that Green wouldn't help him or give him any money to get a bus ticket. Dorsey did not see appellant again after that.

Lastly, the State called Detective Dana Richardson from the Nueces County Sheriff's Office, the lead detective for the investigation into Montez's murder. After identifying Montez, Detective Richardson interviewed Montez's family members, where he learned that Huehlefeld was a friend of Montez. He then went to Montez's apartment where he heard from the owner of the apartments. The owner mentioned that he had

10

problems with a "black male driving a white Cadillac" dealing drugs on his property, who associated with Huehlefeld. The officer began looking into Huehlefeld's known associates, which led to Green, who drove a white Cadillac. The owner of the apartment complex also provided surveillance video which allowed Detective Richardson to identify Huehlefeld and appellant leaving Montez's apartment on the date of the murder.

His investigation led him to appellant, who, after being asked, voluntarily came to the sheriff's office to answer questions. After several inconsistent interviews, appellant admitted his involvement in the shooting of Montez. Detective Hardin testified that appellant also discussed his and Green's membership in a gang and that appellant referred to Green as "a punk." Appellant repeatedly stated that he was not afraid of Green.

Appellant accompanied officers to attempt to locate the discarded gun used in the shooting. Appellant also accompanied officers on a walkthrough at the scene of the shooting. During the walkthrough, appellant stated that when he heard Montez moan, he knew he had done something he did not want to do.

The defense did not call any witnesses. The jury returned a guilty verdict on both counts in the indictment and assessed punishment at imprisonment for forty-six years and twenty-five years, respectively, in the Texas Department of Criminal Justice—Institutional Division. This appeal followed.

## II.    MURDER CONVICTION

By his first issue, appellant contends the evidence is legally and factually insufficient to support the jury's rejection of the affirmative defense of duress.

## A.    Standard of Review & Applicable Law

We may review a finding rejecting an affirmative defense for both legal and factual

sufficiency. *Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015); *Matlock v. State*, 392 S.W.3d 662, 668–70 (Tex. Crim. App. 2013). When a defendant challenges the legal sufficiency of the evidence supporting the jury's rejection of an affirmative defense, we examine the record for any evidence that supports the jury's negative finding while ignoring all evidence to the contrary, unless a reasonable jury could not. *See Matlock*, 392 S.W.3d at 669. If no evidence supports the jury's negative finding, we examine the entire record to determine whether the evidence establishes the issue as a matter of law. *Id*. A jury's finding on a defendant's affirmative defense should be overturned for lack of legally sufficient evidence only if the evidence conclusively proves the affirmative defense and no reasonable jury was free to think otherwise. *Id*. at 670.

In a factual-sufficiency review of a finding rejecting an affirmative defense, and unlike in a legal-sufficiency review, courts examine the evidence in a neutral light. *Matlock*, 392 S.W.3d at 671. A finding rejecting a defendant's affirmative defense cannot be overruled unless, "after setting out the relevant evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *Id*.

**B.    Discussion**

There is no dispute that the evidence was sufficient to show that appellant shot and killed Montez; however, he raised an affirmative defense of duress and argues that the evidence does not "overcome the affirmative defense of duress." To establish the affirmative defense of duress, a defendant must prove by a preponderance of the evidence that he committed the offense because he was compelled to do so by threat of imminent death or serious bodily injury to himself or another. TEX. PENAL CODE ANN.

§ 8.05(a). Compulsion "exists only if the force or threat of force would render a person of reasonable firmness incapable of resisting the pressure." *Id.* § 8.05(c); *see Edwards v. State*, 106 S.W.3d 833, 843 (Tex. App.—Dallas 2003, pet. ref'd). "'Imminent' means something that is immediate, something that is going to happen now." *Murkledove v. State*, 437 S.W.3d 17, 25 (Tex. App.—Fort Worth 2014, pet. dism'd) (citing *Dewalt v. State*, 307 S.W.3d 437, 454 (Tex. App.—Austin 2010, pet. ref'd)). "Harm is imminent when there is an emergency situation and it is 'immediately necessary' to avoid that harm, in other words, when a 'split-second decision' is required without time to consider the law." *Id.* (quoting *Pennington v. State*, 54 S.W.3d 852, 857 (Tex. App.—Fort Worth 2001, pet. ref'd)). Imminence "has two components: (1) the person making the threat must intend and be prepared to carry out the threat immediately, and (2) the threat must be predicated on the threatened person's failure to commit the charged offense immediately." *Cormier v. State*, 540 S.W.3d 185, 190 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (citing *Devine v. State*, 786 S.W.2d 268, 270–71 (Tex. Crim. App. 1989) and *Anguish v. State*, 991 S.W.2d 883, 886 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd)); *see Ramirez v. State*, 336 S.W.3d 846, 851 (Tex. App.—Amarillo 2011, pet. ref'd).

Imminent harm must be shown by affirmative evidence. *Darty v. State*, 994 S.W.2d 215, 218–19 (Tex. App.—San Antonio 1999, pet. ref'd). A threat of harm at some indefinite time in the future is insufficient to satisfy the requirement of imminence. *Ramirez*, 336 S.W.3d at 851–52; *Anguish*, 991 S.W.2d at 886. Further, the affirmative defense of duress is not available "if the actor intentionally, knowingly, or recklessly placed himself in a situation in which it was probable that he would be subjected to compulsion." TEX. PENAL CODE ANN. § 8.05(d). And evidence of a generalized fear of harm

is not sufficient to raise the issue of imminent harm. *Brazelton v. State*, 947 S.W.2d 644, 648 (Tex. App.—Fort Worth 1997, no pet.). If undisputed facts indicate a complete absence of immediate necessity or imminent harm, then a defendant's sincere belief that his conduct is immediately necessary to avoid imminent harm is unreasonable as a matter of law. *Dewalt*, 307 S.W.3d at 454.

Appellant stated that he was worried that Green would kill him if he did not participate, but there is no evidence that Green made a specific, objective threat to appellant if appellant did not shoot Montez. *See Cameron v. State*, 925 S.W.2d 246, 250 (Tex. App.—El Paso 1995, no pet.) (finding no objective basis for a claim of compulsion when evidence showed only that defendant was afraid of co-conspirator's temper and followed his orders). Appellant argues that he shot and killed Montez at Green's instruction because Green had a gun and would have killed him if he didn't shoot Montez. However, the only evidence that Green would have killed him if he didn't kill Montez came from appellant's account of the incident and his belief that Green would have acted that way, which the jury was free to reject. *See Walker v. State*, 594 S.W.3d 330, 335 (Tex. Crim. App. 2020) (noting that the jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to give their testimony). Moreover, appellant's claim of duress is inconsistent with evidence showing that appellant went home after the shooting, and after an argument with his girlfriend the next day, appellant went to Green's apartment on his own initiative. The jury, as the trier of fact, could have also taken into account the testimony of Dorsey regarding the events that took place leading to the murder of Montez. Based on the evidence, the jury could have rationally concluded appellant was not faced with an imminent threat to himself. *See, e.g., Murkledove*, 437 S.W.3d at 25; *Dewalt*, 307

14

S.W.3d at 454.

Although the evidence that appellant feared Green, that he told detectives Green was going to kill him, and that Green was violent may circumstantially support a finding of duress, it does not conclusively establish such a finding—particularly given the evidence showing appellant repeatedly going to Green's apartment willingly after the offense occurred. *See Matlock*, 392 S.W.3d at 669-70. Because evidence exists to support the jury's implied negative finding on duress, the record satisfies the first part of the legal sufficiency standard, and we need not consider the second part of the analysis. *See id*. The evidence is, thus, legally sufficient to support the jury's negative finding on duress. Furthermore, given the evidence the jury had before it, we cannot say that the "verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *See id*. at 671.

We overrule appellant's first issue.

### III.    ENGAGING IN ORGANIZED CRIMINAL ACTIVITY

By his second issue, appellant contends that the evidence is "factually and legally insufficient to sustain the jury's verdict of guilty of engaging in organized criminal activity."[4]

### A.    Standard of Review & Applicable Law

When reviewing claims of legal insufficiency, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Whatley v. State*, 445 S.W.3d 159, 166

---

[4] Texas courts have not recognized a distinction between legal and factual sufficiency in criminal proceedings for ten years; the *Jackson v. Virginia*, 443 U.S. 307 (1979), legal sufficiency standard is the only standard for reviewing the constitutional sufficiency of the evidence. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.).

(Tex. Crim. App. 2014). The fact finder is the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given to the testimony and is presumed to have resolved any conflicts in the evidence in favor of the verdict. *See Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008); *see also Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (giving deference to the fact-finder "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").

"Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt." *Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim App. 2013) (citing *Hooper*, 214 S.W.3d). Juries are permitted "to draw reasonable inferences as long as each inference is supported by the evidence presented at trial." *Hooper*, 214 S.W.3d at 15. "However, juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions." *Id*.

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240.

## B.    Discussion

A hypothetically correct jury charge would instruct the jury to find appellant guilty

of engaging in organized criminal activity if, with the intent to establish, maintain, or participate in a combination, appellant conspired to commit Montez's murder. *See* TEX. PENAL CODE ANN. § 71.02(a)(1). A "combination" is "three or more persons who collaborate in carrying on criminal activities." *Id.* § 71.01(a).

The State contends that appellant has inadequately briefed this issue, arguing that he merely makes conclusory statements and does not "discuss the evidence in any detail," presenting nothing for appellate review. *See* TEX. R. APP. P. 38.1(i). We agree. Although appellant tends to argue that he should not have been found guilty because he was under duress, we have already addressed that issue above. Aside from that argument, he next states—with no record citations, no authority citations, and no other support—that the evidence is "too weak to support a finding of guilt beyond a reasonable doubt." Appellant does not discuss, at any point, the elements of the crime for which he was convicted, nor how the evidence was insufficient to meet those elements.

> An appealing party's brief must contain a "clear and concise argument for the contentions made, with appropriate citations to authorities and to the record. Failure to provide substantive legal analysis—"to apply the law to the facts"—waives the point of error on appeal. If the appealing party fails to meet its burden of adequately discussing its points of error, this Court will not do so on its behalf.

*Linney v. State*, 413 S.W.3d 766, 767 (Tex. Crim. App. 2013) (Cochran, J., concurring in the refusal to grant petition for discretionary review) (internal citations omitted); *see* TEX. R. APP. P. 38.1; *see also Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2011); *Swearingen v. State*, 101 S.W.3d 89, 100 (Tex. Crim. App. 2003). Appellant does not provide a citation to the record. Further, appellant does not apply the law to the facts. Although appellant sets forth some law regarding the standard of review on a sufficiency challenge, he fails to explain why he believes that the evidence is insufficient without

17

merely making conclusory statements, including that he was not "at or near the scene of the shooting." But then in the next paragraph states that "he was under duress and fearing for his life." Appellant has not, regarding any of the evidence, applied the law to the facts as the appellate rules require. Therefore, he has inadequately briefed this point. *See* TEX. R. APP. P. 38.1; *Lucio*, 351 S.W.3d at 896; *Swearingen*, 101 S.W.3d at 100. Appellant's second issue is overruled.

## IV. CONCLUSION

We affirm the trial court's judgment.

NORA L. LONGORIA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
22nd day of December, 2020.